*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0099p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JAMES DIXON, JR.,

        *Plaintiff-Appellant,*

*v.*

No. 05-2216

ALBERTO GONZALES, United States Attorney
General and ROBERT S. MUELLER, III, FBI Director,
        *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 02-74476—John Feikens, District Judge.

Argued: December 11, 2006

Decided and Filed: March 14, 2007

Before: MOORE and COLE, Circuit Judges; MARBLEY, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Benjamin Whitfield, Jr., Detroit, Michigan, for Appellant. William L. Woodard, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellees. **ON BRIEF:** Benjamin Whitfield, Jr., Detroit, Michigan, for Appellant. William L. Woodard, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellees.

_____

## OPINION

_____

ALGENON L. MARBLEY, District Judge.

### I. INTRODUCTION

Plaintiff-Appellant James Dixon, Jr. ("Dixon") appeals the district court's order granting summary judgment for Defendant-Appellee Alberto Gonzales, sued in his official capacity as Attorney General of the United States and Defendant-Appellee Robert S. Mueller, III, sued in his official capacity as the Director of the Federal Bureau of Investigation ("FBI") (collectively, the

_____

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

"Attorney General"). Dixon alleges that he was denied reinstatement as a Special Agent with the FBI as a result of unlawful retaliation by a former supervisor, about whose racially discriminatory conduct Dixon had previously complained.

After this Court reversed and remanded the district court's initial order dismissing the case, *Dixon v. Ashcroft*, 392 F.3d 212 (6th Cir. 2004) ("*Dixon I*"), the Attorney General brought a second motion for summary judgment arguing that Dixon had failed to exhaust his administrative remedies and that Dixon had failed to establish a prima facie case of retaliation. The district court rejected the Attorney General's failure-to-exhaust argument but granted summary judgment on the grounds that Dixon did not establish a prima facie case. For the reasons set forth herein, we **AFFIRM** the district court's judgment.

## II. BACKGROUND

James Dixon, Jr. is an African-American male who worked as a Special Agent for the FBI's Detroit field office between 1978 and 1988. Between 1981 and 1982, Dixon served as the Applicant Coordinator for the Detroit office's Applicant Program. In this position, Dixon was responsible for all aspects of recruiting new agents to the FBI for the Detroit office.

From November 1981 to February 1982, Assistant Special Agent in Charge Robert Reutter oversaw the Applicant Program, and directly supervised Dixon's work. Dixon alleges that Reutter exhibited racial animus towards him and Henry Glaspie, Dixon's colleague and assistant in managing the Applicant Program, who is also African-American. For instance, Dixon testified that Reutter expressed concern to him and Glaspie about two African-American agents running the Applicant Program and, therefore, required them to report their work-related activities on a weekly basis. Reutter also allegedly stated that he did not want the three-person boards that interviewed prospective new agents to consist of three African-American agents when minority applicants were being interviewed. Dixon also testified that while Reutter was "jovial and social" with white agents, he was "chilling and cold" to him, that Reutter condescended to African-American agents, and that he treated African-American agents as though he thought they were incompetent.

In December 1981, Dixon complained about Reutter's discriminatory behavior to Special Agent in Charge Anthony Davis, who is also African-American. According to Dixon, Davis said that Dixon's allegations about Reutter concerned him and that he would take care of the problem. In February 1982, Davis relieved Reutter of his position overseeing the Applicant Program and Davis himself took over those duties. The Attorney General concedes that Reutter's dismissal from the Applicant Program was "apparently as a result of Dixon's complaints."

In approximately June 1982, Dixon transferred from the Applicant Program to the White Collar Crime unit. A few months later, in November 1982, Reutter became the head of the White Collar Crime unit and remained in that post until he left the Detroit field office in 1986. During this period, Reutter and Dixon did not have direct contact, but Reutter was Dixon's second-line supervisor. As part of his responsibilities, Reutter reviewed the annual performance evaluations prepared by Dixon's immediate supervisor and approved them. Dixon testified that Reutter had the authority either to approve or disapprove of these performance evaluations. During his tenure in the White Collar Crime unit, Dixon testified that his evaluations were always favorable, and included ratings of "superior" and "excellent."

In 1988, Dixon resigned from the FBI to assist his wife in a business venture. In 1991, Dixon applied for reinstatement. The FBI initiated the reinstatement process by interviewing Dixon and references provided by Dixon as "friends or acquaintances employed by the FBI," which included Carey Thornton ("Thornton"), John Anthony ("Anthony"), and Larry Kuhl ("Kuhl").

The FBI interviewed Anthony, and he recommended against reinstating Dixon. Anthony based his negative review on an alleged incident that occurred in the early 1980s, when Dixon was assigned to applicant recruitment in Detroit, and Anthony was the principal FBI-Detroit legal advisor. The two men, along with Special Agent Robert Nelson ("Nelson"), sat on an interview panel together. Dixon was the lead interviewer on this panel and was responsible for submitting the panel's opinion of the interviewee.

As Anthony recalled the incident, the panel voted to reject a minority applicant, but Dixon subsequently changed the results to a favorable determination without Nelson's or Anthony's permission or knowledge. According to Anthony, he confronted Dixon, and Dixon acknowledged that he had changed the rating, and apologized. Because of the incident, however, Anthony questioned Dixon's integrity and honesty, opining that Dixon was not sufficiently trustworthy to work for the FBI.

Given this incident, Bureau investigators also interviewed Nelson. Nelson essentially conveyed to investigators what they heard from Anthony, although Nelson added that, when it happened, he reported Dixon's conduct to then Assistant Special Agent in Charge Reutter. Apparently, a formal report of the incident was never made, as evidenced by the fact that Dixon's personnel file with the FBI contained no mention of it. In Nelson's opinion, the FBI would make a "grave mistake" by rehiring Dixon because Nelson believed Dixon lacked integrity and fidelity, and could not be trusted.

The FBI then contacted Reutter and asked for his views on whether Dixon should be reinstated. By 1992, when he was solicited for his opinion, Reutter was serving as Special Agent in Charge of the Philadelphia division. Reutter recalled that two agents had accused Dixon of changing an applicant's score, and he recalled that Dixon had admitted doing so. Based upon this incident and Reutter's recollection that Dixon had poor work habits, a poor work ethic, and little enthusiasm for his job during his early years with the FBI, Reutter described Dixon's efforts as mediocre at best and recommended against reinstating Dixon.

Another of Dixon's former supervisors, David Ries ("Ries"), supervised him in 1987 and 1988, and Ries' opinion was that Dixon demonstrated a lack of commitment, although Ries believed Dixon was capable of performing his duties. Ries also questioned Dixon's dedication and refused to make a recommendation concerning Dixon's reinstatement. Kuhl, a former supervisor and one of the referrals provided by Dixon, described Dixon as competent and articulate and commented favorably on his character, abilities, reputation and loyalty. He recommended Dixon for reinstatement, although he commented that he would have liked to have interviewed Dixon to discern his motivations for seeking reinstatement. Finally, Thornton, the last of Dixon's referrals and one of his former co-workers, recommended in favor of reinstating him. Thornton opined that Dixon was an effective investigator, "who conducted his business in an appropriate manner."

After reviewing these various recommendations, on April 14, 1992, the FBI wrote Dixon a letter informing him that he would not be reinstated. Dixon maintains that he did not receive this letter and that he did not learn about the FBI's decision until 1994 when he called the Detroit field office to inquire about the status of his application. During this call, the FBI would reveal only that its refusal to reinstate Dixon was predicated upon negative evaluations from some of Dixon's former colleagues and supervisors. Following this telephone conversation, Dixon submitted a request under the Freedom of Information Act ("FOIA") to receive his personnel file from the FBI. Dixon received the requested documents in May 1997, which included a copy of Reutter's negative recommendation.

On July 8, 1997, Dixon contacted an EEO counselor. He filed a formal EEO complaint on August 20, 1997. After the agency adjudication process was completed, Dixon's complaint for

discriminatory retaliation ultimately was dismissed. *Dixon*, 392 F.3d at 216. On November 12, 2002, Dixon filed suit in the Eastern District of Michigan asserting, among other things, that Reutter's negative appraisal constituted retaliation in response to Dixon's complaints about Reutter's racially discriminatory behavior, and that this unlawful retaliation formed the basis for the FBI's decision not to reinstate Dixon. The district court dismissed Dixon's case on March 12, 2003 on the grounds that he had failed to exhaust his administrative remedies because, although he brought suit under Title VII for unlawful retaliation, he did not include these allegations in his EEO complaint.

In an opinion issued on December 16, 2004, we reversed the district court's judgment. We held that in a statement attached to his EEO complaint, Dixon set forth sufficient factual detail to apprise the EEOC of his retaliation claim. *Dixon*, 392 F.3d at 217-18.

On remand, the Attorney General moved to dismiss or, in the alternative, for summary judgment, arguing that Dixon failed timely to seek EEO counseling and therefore had failed to exhaust his administrative remedies or, in the alternative, that Dixon failed to make out a prima facie case of retaliation. The district court granted the motion on July 18, 2005. The court held that the forty-five-day limitations period for seeking EEO counseling was equitably tolled and did not bar Dixon's retaliation claim. The district court further held that Dixon failed to make out a prima facie case of retaliation because he had not shown a causal connection between the protected Title VII activity and the adverse employment decision. On August 5, 2005, Dixon timely appealed.

## III.  ANALYSIS

### A.  Standard of Review

We review a district court's grant of summary judgment de novo, employing the same standard as the district court. *Farhat v. Jopke*, 370 F.3d 580, 587 (6th Cir. 2004). Summary judgment is appropriate where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the burden of proving the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In response, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). In determining whether the movant has met his burden, we view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

### B.  Equitable Tolling Is Warranted

The Attorney General argues that Dixon's case should be dismissed because he failed timely to avail himself of administrative remedies. Dixon argues that he is entitled to the benefit of equitable tolling.

A plaintiff who alleges that a federal agency has engaged in race discrimination must initiate contact with an EEO counselor within forty-five days of the date of the alleged discriminatory act. 29 C.F.R. § 1614.105(a)(1); *Steiner v. Henderson*, 354 F.3d 432, 435 (6th Cir. 2003). A district court may dismiss a case where a plaintiff has failed to comply with this requirement. *Id.* Because the forty-five-day limitations period is a prerequisite to filing suit and not a jurisdictional requirement, it is subject to equitable tolling, waiver, and estoppel. *Mitchell v. Chapman*, 343 F.3d 811, 820 (6th Cir. 2003).

The equitable tolling doctrine does not delay the start of the limitations clock, but rather halts its ticking after the limitations period has accrued. *Amini v. Oberlin College*, 259 F.3d 493, 498-500 (6th Cir. 2001). Thus, in the Title VII context, the limitations period begins to run when the adverse employment decision is communicated to the plaintiff, but may be tolled by equitable circumstances.

*Id.*; *EEOC v. United Parcel Serv., Inc.*, 249 F.3d 557, 561-62 (6th Cir. 2001) (per curiam) (stating that "the United States Supreme Court has held that the limitations period does not begin to run on a claim for employment discrimination until an employer makes and communicates a final decision to the employee").

The Supreme Court has observed that equitable tolling is typically applied "only sparingly." *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990). The following five factors are relevant to a determination of whether tolling should be allowed: (1) lack of notice of the filing requirement; (2) lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) the plaintiff's reasonableness in remaining ignorant of the particular legal requirement. *Seay v. Tennessee Valley Auth.*, 339 F.3d 454, 469 (6th Cir. 2003). The foregoing factors are not exclusive and the tolling decision should be made on a case-by-case basis. *Id.*; *Amini*, 259 F.3d at 500.

We review a district court's equitable tolling decision for an abuse of discretion. *Dunlap v. United States*, 250 F.3d 1001, 1007 n.2 (6th Cir. 2001) (stating that a de novo standard of review applies "where the facts are undisputed or the district court rules as a matter of law that equitable tolling is unavailable" and that an abuse of discretion standard applies "in all other cases").

The district court concluded that Dixon failed to meet the first, second, and fifth factors set forth above. Nonetheless, the district court permitted equitable tolling of the forty-five day limitations period because it determined that this Court's decision in *Dixon I* mandated such a ruling and that Dixon's delay in initiating EEO counseling "was due to the FBI's lag in delivering Plaintiff's personnel file to him."

We agree with the district court that equitable tolling should apply in this case, but disagree with the logic behind the district court's decision. This Court's decision in *Dixon I* did not compel the district court to apply the doctrine of equitable tolling.[1] Rather, we conclude that Dixon's delay in seeking EEO counseling was due to circumstances beyond his control, namely, the lack of a prompt response to his FOIA request. Accordingly, equitable tolling is warranted here.

The Attorney General challenges the district court's equitable tolling ruling. *See El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 479 (1992) ("[a]bsent a cross-appeal, an appellee may urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court"). The Attorney General insists that Dixon had a duty to initiate EEO counseling within forty-five days of learning, in 1994, that the FBI had denied his application for reinstatement. At this point, says the Attorney General, Dixon should have surmised that Reutter played a role in the reinstatement process and that Dixon was rejected due to Reutter's racist attitudes. Instead, according to the Attorney General, Dixon impermissibly waited to seek EEO counseling until approximately three years later, on July 8, 1997, after he had requested and received his FBI personnel file.

The Attorney General's argument is without merit. The law does not demand that Dixon exercise clairvoyance. Dixon learned for the first time in 1994 that his request for reinstatement had been denied when he called the Detroit field office to check on the status of his application. The record reflects that all Dixon knew, because it was all the FBI would tell him, was that the negative reinstatement decision was due to "negative comments from coworkers and supervisors." Such

---

[1]*Dixon I* is inapposite because the issue there was whether exhaustion had not occurred because Dixon had not filed an EEOC charge for retaliation, not whether, as here, exhaustion had not occurred because Dixon failed timely to seek EEO counseling. As such, our decision in *Dixon I* did not compel the district court to apply equitable tolling in this case.

cursory information was hardly sufficient to apprise Dixon of the potential taint of racial animus in the FBI's review process.

Equitable tolling "permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim." *Seay*, 339 F.3d at 469 (quoting *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990)). The forty-five-day limitations period for seeking EEO counseling accrued in 1994 when Dixon learned of the FBI's adverse employment action, but at that time Dixon did not have a basis for believing that his denial was attributable to unlawful discrimination. In *Seay*, this Court held that equitable tolling was proper where the defendant omitted "critical information Plaintiff needed to raise his suspicions about [the defendant's] possible racially discriminatory motive in rejecting him." *Id.* at 469. Similarly, in *Cada*, the Seventh Circuit stated,

> If a reasonable man in Cada's position would not have known until July 7 that he had been fired in possible violation of the age discrimination act, he could appeal to the doctrine of equitable tolling to suspend the running of the statute of limitations for such time as was reasonably necessary to conduct the necessary inquiry.

*Id.* at 451.

In *Amini*, this Court declined to apply equitable tolling where it concluded that the plaintiff college professor failed diligently to pursue his rights. The Court found that the plaintiff could have discovered that he had a possible employment discrimination claim by directly asking the defendant college who it had hired instead of him. Rather, the plaintiff only endeavored to learn the identity of his competitor by checking the college's web site and scanning a departmental announcement board. *Amini*, 259 F.3d at 501. The *Amini* court stated that "[t]he case for equitable tolling relief would be different had [the defendant] refused or delayed Amini's efforts to learn whom the College had hired for its statistics position." *Id.* at 502.

In this case, the FBI both refused and delayed Dixon's attempts to uncover the basic facts surrounding its rejection of his reinstatement request. When Dixon telephoned the FBI in 1994, the agency refused to disclose any information to him other than the fact that its adverse decision turned on the negative appraisals of unspecified coworkers and supervisors. Confronted with the FBI's silence, Dixon filed a FOIA request to obtain his personnel file. Although there is no evidence suggesting that the FBI improperly delayed responding to Dixon's FOIA request, the fact remains that the FBI did not release Dixon's personnel file until May 15, 1997, nearly three years after Dixon submitted his FOIA application. It was only by reviewing these documents that Dixon learned about Reutter's unfavorable evaluation, and therefore suspected that Reutter's comments were driven by a desire to retaliate against him for his 1981-82 complaints about Reutter's allegedly discriminatory behavior. Dixon did not wait to seek EEO counseling until he was certain that racial discrimination played a role in the FBI's reinstatement decision, but only until he was "aware of the possibility that he had suffered an adverse employment action because of illegal discrimination." *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 860-61 (7th Cir. 2005).

Accordingly, we **AFFIRM** the district court's judgment that equitable tolling applies in this case.

### C. Dixon Has Failed to Make Out Prima Facie Case of Retaliation

The 1964 Civil Rights Act protects from retaliation employees who have opposed discriminatory employment practices. 42 U.S.C. § 2000e-3(a) (2006). Courts analyzing retaliation claims apply the *McDonnell Douglas/Burdine* framework of shifting burdens of production and proof. *Harrison v. Metro. Gov't of Nashville and Davidson County, Tennessee*, 80 F.3d 1107, 1118

(6th Cir. 1996). In order to make out a prima facie case of retaliation, a plaintiff must establish that: (1) he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). If the plaintiff succeeds in making out the elements of a prima facie case, "the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." *Morris*, 201 F.3d at 792-93 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the defendant satisfies its burden of production, the burden shifts back to the plaintiff to demonstrate "that the proffered reason was not the true reason for the employment decision." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion throughout the process. *Morris*, 201 F.3d at 793.

The Attorney General does not dispute that Dixon has established the first three elements of a prima facie case of retaliation. The only question is whether Dixon has demonstrated a causal connection between the protected activity (his complaints that Reutter discriminated against African-American employees) and the adverse employment action (the FBI's decision to not reinstate Dixon). To establish a causal connection, a plaintiff must "'proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action.'" *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (quoting *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990) (citations omitted)). The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity. *Avery*, 104 F.3d at 861.

Proof of temporal proximity between the protected activity and the adverse employment action, "coupled with other indicia of retaliatory conduct," may give rise to a finding of a causal connection. *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006) ("although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection"); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000) ("temporal proximity alone does not support an inference of retaliatory discrimination in the absence of other evidence"); *Nguyen v. City of Cleveland*, 229 F.3d 559, 565 (6th Cir. 2000) (rejecting the plaintiff's argument that "temporal proximity between the protected activity and the alleged discriminatory act is alone sufficient to establish a causal connection").

In this case, such temporal proximity does not exist. Ten years elapsed between Dixon's complaints to Davis regarding Reutter's discriminatory treatment of African-Americans and the FBI's decision to not reinstate Dixon. The Attorney General argues that the absence of temporal proximity between the protected activity and the alleged retaliation eliminates the possibility of a causal connection between the two. Dixon does not point to any authority holding that a causal connection exists where there has been a gap of multiple years, let alone ten years, between the protected activity and the adverse employment action.

In *Clark County School District v. Breeden*, 532 U.S. 268, 273-74 (2001) (per curiam), the Supreme Court held that a finding of causal connection was not warranted where, among other things, almost two years elapsed between the employee's participation in protected activity and the adverse employment decision. *Id.* at 273. The Supreme Court commented that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Id.* Similarly, this Court has typically found the causal connection element satisfied only where the adverse employment action occurred within a matter of months, or less, of the protected activity. *See, e.g., Randolph v. Ohio*

*Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006) (holding that a causal connection was established where the plaintiff employee was placed on leave within the same month that she complained about workplace sexual assaults and was terminated six months later); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (three months sufficient); *Smith v. City of Salem*, 378 F.3d 566, 571 (6th Cir. 2004) (less than a week sufficient); *DiCarlo v. Potter*, 358 F.3d 408, 421-22 (6th Cir. 2004) (three weeks sufficient); *but see Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (two to five months insufficient).

Dixon argues that the district court erred by focusing narrowly on the ten-year period that elapsed here and failing to take into account the surrounding facts. In particular, Dixon argues that a finding of causal connection is not foreclosed because Reutter did not have the ability to retaliate against him until Reutter's views on Dixon were solicited during the FBI's reinstatement investigation. Dixon claims that from the time Reutter was removed from his position in the Applicant Program in 1982 until Dixon left the FBI in 1988, Reutter "had no authority or supervisory power over [Dixon] and was not in a position to legitimately interfere with [his] employment." Dixon argues that Reutter retaliated against him at the first opportunity he had and as such, the lack of temporal proximity between Dixon's 1982 complaint and Reutter's 1992 recommendation does not break the causal link between Dixon's protected activity and the denial of his reinstatement to the FBI.

We agree with Dixon insofar as a mere lapse in time between the protected activity and the adverse employment action does not inevitably foreclose a finding of causality. This is especially true in the context of a *reinstatement* case, in which the time lapse between the protected activity and the denial of reinstatement is likely to be lengthier than in a typical employment-discrimination case.

Dixon's argument finds support in applicable case law. In *Ford v. General Motors Corp.*, 305 F.3d 545, 552 (6th Cir. 2002), the plaintiff alleged that his supervisor retaliated against him as a result of the plaintiff's filing of a race-discrimination charge with the EEOC. For a five-month period following his EEOC filing, the plaintiff voluntarily worked in a different position and was not within his supervisor's sphere of authority. *Id.* at 550. When the plaintiff was placed back under his supervisor's direction, however, the supervisor allegedly retaliated by imposing an increased workload on plaintiff, subjecting his performance to heightened scrutiny, and threatening to terminate him. *Id.* at 550-51. This Court determined that the five-month interval between the protected activity and the adverse employment actions did not foreclose a finding of a causal connection because the plaintiff was under the control of a different supervisor during this period. *Id.* at 554-55.

In *Porter v. California Dep't of Corr.*, 419 F.3d 885 (9th Cir. 2005), the Ninth Circuit employed a similar analysis. The plaintiff in *Porter* brought suit alleging that she was retaliated against because she complained about sexual harassment. *Id.* at 887. The plaintiff reported her complaints in 1995 but the alleged retaliation—the denial by the plaintiff's alleged harasser of her various requests for transfers—did not occur until 1998. *Id.* at 887-89. In rendering its decision, the Ninth Circuit first cited approvingly from the Third Circuit's decision in *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997), in which the Third Circuit emphasized that causation is a fact-specific inquiry and is not reducible merely to a measurement of temporal proximity:

> It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn. The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific. When there may be valid reasons why the adverse

employment action was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation.

*Porter*, 419 F.3d at 895 (quoting *Kachmar*, 109 F.3d at 177).

The Ninth Circuit then went on to conclude that the multi-year gap between the plaintiff's protected activity and the adverse employment actions did not defeat a finding of a causal connection because the plaintiff's harasser did not have the opportunity to retaliate until he was given responsibility for making personnel decisions. *Id.*

Although *Ford* and *Porter* support Dixon's argument that the ten-year gap in time is not dispositive of the causation requirement, Dixon's argument fails in light of the undisputed record evidence. As described above, Reutter was Dixon's second-line supervisor for four years when both worked in the White Collar Crime unit. The parties agree that Reutter and Dixon never directly interacted during this period, but Dixon concedes that Reutter reviewed and signed off on the positive performance evaluations prepared by Dixon's immediate supervisor.

Dixon seeks to minimize the significance of these facts by arguing on reply that Reutter was deterred from retaliating against him because Davis allegedly warned Reutter to refrain from causing any trouble for Dixon. Reutter was removed from his duties overseeing the Applicant Program by Davis and Reutter admits in his reinstatement assessment of Dixon that Davis told Reutter that he "was to have nothing more to do with" the Applicant Program. Nonetheless, Dixon has not pointed to any record evidence showing that Davis effectively prevented Reutter from taking any negative actions concerning Dixon when Dixon was within Reutter's supervisory chain-of-command in the White Collar Crime unit. There is no evidence suggesting that Davis instructed Reutter to distance himself permanently from Dixon, or that Davis made an open-ended threat to take disciplinary action against Reutter if Dixon ever again lodged any complaints about Reutter. Whether Davis' purported omnipresence prevented Reutter from retaliating before 1992 is also irrelevant. As Dixon's second-line supervisor, Reutter clearly had the opportunity to retaliate, which is all the law requires. *See, e.g., Porter*, 419 F.3d at 895. Reutter could have easily exercised his authority either as Dixon's superior, or as the last person to sign off on Dixon's evaluations, to attempt to torpedo Dixon's career. He did not. Even Dixon concedes that his argument as to why Reutter did not retaliate during this period is mere speculation. (Plaintiff's reply at 2).

Davis's own testimony reinforces the conclusion that a causal connection is lacking between Dixon's protected activity and the FBI's negative reinstatement decision. Davis testified that he relieved Reutter of his responsibilities over the Applicant Program because he did not believe that Reutter's management style was consistent with maintaining the program's high degree of success. (Joint Appendix "JA" 709-13.) Davis further testified that although he had very little memory of Dixon, he did not recall any complaints about Reutter behaving in a racially invidious way, that he did not recall being informed about any racially pejorative remarks made by Reutter, and that he could not say that he felt Reutter was insensitive to Dixon and Glaspie as minority agents. (JA 710; 714; 715.)

Moreover, Dixon has failed to establish the causation element of his prima facie case because he has not proffered sufficient evidence to raise the inference that Reutter's negative recommendation likely caused the denial of his reinstatement to the FBI, or that it even was retaliatory in nature. By failing to show this, the causal link between Dixon's protected activity and the denial of his reinstatement collapses.

There is no evidence that Reutter sought to retaliate against Dixon. In fact, the agents reviewing Dixon's request for reinstatement solicited Reutter's opinion, not the other way around. Furthermore, Reutter was not the first, but rather the third person to give Dixon a negative review.

Only after Dixon received negative assessments from both Anthony and Nelson, did Dixon's reviewers solicit Reutter's opinion. Moreover, the record reflects that Anthony, Nelson, and Reutter all based their negative assessments on the same incident–Dixon unilaterally changing an applicant's admission recommendation. Given the presence of other negative assessments that occurred before Reutter's, the Court cannot reasonably draw the inference, based on the record evidence, that Dixon's 1982 complaint against Reutter was likely the reason that he did not get reinstated.

Thus, even drawing all reasonable inferences in Dixon's favor, Dixon has failed to show that there are any genuine issues of material fact regarding the causation element of the prima facie case. Therefore, we **AFFIRM** the district court's judgment that the Attorney General is entitled to summary judgment as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.