NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0382n.06

No. 18-1334

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

<table>
<tr><td>ANDREW WALLACE,</td><td>)</td><td rowspan="11">FILED<br>Jul 29, 2019<br>DEBORAH S. HUNT, Clerk<br><br>ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Plaintiff-Appellant,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>EDWARD W. SPARROW HOSPITAL ASSOCIATION,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Defendant-Appellee.</td><td>)</td></tr>
</table>

BEFORE: BATCHELDER, SUTTON, and WHITE, Circuit Judges.

HELENE N. WHITE, Circuit Judge.

Plaintiff-Appellant Andrew Wallace (Wallace) appeals the district court's grant of summary judgment to his former employer Defendant-Appellee Edward W. Sparrow Hospital Association (Sparrow) in this action alleging that Sparrow violated his rights under the Americans with Disabilities Act (ADA), the Michigan Persons With Disabilities Civil Rights Act (PWDCRA), and the Family and Medical Leave Act (FMLA). For the reasons that follow, we **AFFIRM**.

**BACKGROUND**

Wallace was first diagnosed with ADHD when he was in the second grade. After Wallace graduated from high school, he served in the military from 1996 to 1999, and then admirably re-

enlisted to serve again from 2002 to 2004. Wallace suffers from PTSD relating to his military service.

On March 17, 2007, Sparrow hired Wallace as a security officer. Security officers are subject to Sparrow's Attendance Policy, which uses an employee's anniversary date to count unexcused absences. Wallace's anniversary date was March 19. According to the Attendance Policy, an "absence occurrence" is any absence from work for a period of two or more hours that was not approved in advance by a supervisor or manager. The Attendance Policy states that disciplinary action will occur under the following circumstances:

> Disciplinary Action: A Caregiver[1] will be issued the appropriate level of discipline, as provided below, for:
>
> 1. Each absence occurrence in excess of eight in a twelve-month period commencing with their anniversary date. If a Caregiver is absent for three or more consecutive work days, the third and each subsequent day of absence will be counted as an additional occurrence unless the Caregiver, on the day they return to work, presents medical documentation justifying such absence. Should an absence occurrence occur prior to the discipline record being cleared as provided below, the next level of discipline will be imposed, provided the Caregiver has at least two absence occurrences in their anniversary year.

(R. 19-3, PID 309.) The Attendance Policy explains that there are four levels of discipline relating to the number of absence occurrences. When an employee reaches nine absence occurrences in the twelve-month period measured from the employee's anniversary date, Sparrow assigns Level 1 discipline. Ten absence occurrences result in Level 2 discipline; eleven absences Level 3; and twelve absences Level 4, at which point Sparrow terminates the employee's employment as a matter of course. (*Id.*, R. 19-2, PID 300 ("Upon receiving a Level 4 discipline, the caregiver's employment is terminated.").)

---

[1] Security officers are included in the Caregiver category. (*See* Affidavit of Todd Cassidy, R. 19-2, PID 300 (referring to security officers as caregivers, who are subject to Sparrows Attendance/Punctuality policy).)

The Attendance Policy includes a FMLA Leave Policy and a separate Leave of Absence Policy. Sparrow's FMLA Leave Policy provides that eligible employees are entitled to twelve weeks (84 days) of leave during a "rolling" twelve-month period. Sparrow also has a separate Leave of Absence Policy that allows for 120 total days of unpaid leave during any "rolling" twelve-month period. (R. 19-5, PID 317-319.) Approved leave under the FMLA runs concurrently with approved leave under the Leave of Absence Policy. When Sparrow grants an employee medical leave, that employee's position will be held open for up to 120 calendar days in accordance with the Leave of Absence Policy. If the employee remains absent after the 120 days of leave are used, the employee's job can be filled and the employee is placed on lay-off status; but if the employee is able to return to work after that time, the employee will be given preferential consideration for job openings for which he or she qualifies.

In 2014, Sparrow approved Wallace for FMLA leave on two occasions: first, for intermittent FMLA leave between May 20 and November 6, 2014 as needed to care for his step-daughter; second, for full-time FMLA leave, from July 4 through August 8, 2014, for septic bursitis in his right elbow. Wallace testified at his deposition that he did not know exactly how many intermittent-leave days he took off to care for his step-daughter, but that it was "a lot." (R. 19-1, PID 280.)

In 2015, Wallace accumulated seven absence occurrences between March 25 and April 9 by missing work on March 25, April 1 and 2, and April 6 through 9. Wallace does not dispute that these were unexcused absence occurrences under the Attendance Policy.

After an event triggered his PTSD and anxiety, Wallace told human resources specialist Lea Anne Jacobs that he would probably be taking some FMLA leave. Wallace missed work again on April 15, 18, 19, and 21. Sparrow issued Wallace a Level 1 Discipline after he missed work on

April 18 because, as of that date, Wallace had accrued nine absence occurrences. Sparrow then issued Wallace a Level 2 discipline after he missed work on April 19. Sparrow's supervisors and human resources personnel exchanged emails regarding Wallace's absences and whether he would receive FMLA leave.

On April 24, 2015, Wallace's psychologist, Lynne Emerson, signed a leave of absence request to allow Wallace to address his PTSD and anxiety. Sparrow received the request on April 28. Dr. Emerson also submitted a disability form on April 29, stating that she had diagnosed Wallace with generalized anxiety disorder and that his disability began on April 14. Sparrow approved Wallace's request for FMLA leave, retroactive to April 14. As a result, Sparrow rescinded Wallace's Level 1 and Level 2 Disciplines for April 18 and 19. Wallace admitted at his deposition that his supervisor told him not to sign the discipline reports because the days were excused as FMLA leave.

After going on medical leave, Wallace informed Sparrow that he would return to work on July 1, 2015. On June 27, Dr. Emerson wrote Sparrow that Wallace would instead return on July 12. On July 7, Dr. Emerson wrote Sparrow again, explaining that Wallace's anxiety and PTSD had worsened and that he would return to work on August 16. After receiving the second letter, human resources officer and disability specialist Julie Donovan sent an email to security manager Todd Cassidy and security supervisor Jerry Dumond stating that Wallace had exhausted his twelve weeks of FMLA leave on May 5, 2015[2] and his 120 days under the Leave of Absence Policy on

---

[2] Sparrow's calculation that Wallace ran out of FMLA leave on May 5, 2015 includes the full-time FMLA leave approved in July and August 2014 for Wallace's hospitalization for septic bursitis, and, apparently, the days taken under the intermittent leave approved for the care of his step daughter. However, the record does not establish how many days of intermittent leave Wallace took.

July 6, 2015.[3] Donovan advised that Wallace would not return to work until August 16 and that his security-officer position could be posted and filled. On July 10, Sparrow posted and filled the position, which was the only full-time security job open at the time.

Dr. Emerson cleared Wallace to return to work on August 16. Because Sparrow had filled his position and there were no openings, Sparrow placed Wallace on "layoff status" awaiting the next job opening as a security officer. (R. 19-17, PID 369.)

Wallace returned to work at Sparrow on December 9, 2015, when a position opened. At that time, Wallace was taking medication to manage his PTSD symptoms and additional medication to manage his ADHD symptoms. On December 15, Wallace went to Sparrow's pharmacy to pick up his ADHD medication, but his doctor had not called it in. On December 16, Wallace told his supervisor that he did not feel comfortable taking part in a mandatory, physical-submission training session scheduled that day without his ADHD medication and would therefore be absent from work. Wallace explained that he was concerned that he might hurt one of his training partners because his ADHD might cause him to be unable to control the amount of pressure he applied in the training. Although Wallace had made it clear that his discomfort was related to his ADHD, his supervisor attributed it to Wallace's PTSD, and the next day Donovan requested paperwork confirming that Wallace was fit to perform his job duties. Dr. Emerson met with Wallace and showed him letters from his co-workers that Donovan had given to her. Dr. Emerson submitted the requested confirmation of Wallace's fitness on December 22.

On January 5, 2016, Wallace spoke with Donovan. Wallace told her that he understood Sparrow was collecting emails from his co-workers about his behavior at work, expressed that he

---

[3] Sparrow determined that Wallace's 120 days under the Leave of Absence Policy had elapsed by counting Wallace's medical leave from July 4, 2014 through August 8, 2014, and April 14, 2015 through July 6, 2015 using the rolling twelve-month calculator.

felt "targeted" due to his disability, and requested that the targeting stop. (R. 19-1, PID 287.) Donovan told Wallace that he should forget about the emails and they would start with a "clean slate" that day. (*Id.*) During this conversation, Wallace requested an accommodation for his PTSD, which he later asked be in the form of a support group that would allow him to talk to his co-workers confidentially about workplace issues. Donovan agreed to schedule a meeting to discuss the proposed accommodation on January 22.

Wallace had unexcused absences on January 20, 21, 23, and 24. On January 22, Donovan called Wallace to cancel their meeting to discuss his accommodations. The parties agree that Wallace did not work the 22nd, but dispute whether he was scheduled to work that day. On January 26, 2016, Sparrow terminated Wallace's employment for having twelve total absence occurrences.

Wallace filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and brought this action after receiving a right-to-sue letter. Sparrow moved for summary judgment after the close of discovery. The district court granted Sparrow's motion, concluding that Sparrow presented a legitimate, non-discriminatory reason for each adverse action alleged by Wallace and that Wallace did not establish a genuine issue whether Sparrow's actions were pretext for discrimination. Wallace now appeals.

## STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment. *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We consider all facts and inferences drawn therefrom in the light most favorable to the nonmovant." *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001). When confronted with a properly supported motion for summary judgment, the

nonmoving party must set forth specific facts showing that there is a genuine issue for trial. A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

### I. FMLA

"The Family and Medical Leave Act declares it unlawful for 'any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided under this subchapter.'" *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 450 (6th Cir. 2005) (quoting 29 U.S.C. § 2615(a)(1)). There are two theories of recovery under the FMLA— the "entitlement" or "interference" theory arising from 29 U.S.C. § 2615(a)(1) and the "retaliation" or "discrimination" theory arising from 29 U.S.C. § 2615(a)(2). *See Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 555 (6th Cir. 2006). On appeal, Wallace challenges the district court's ruling with respect to both FMLA claims.

### A. FMLA Interference

We analyze an FMLA interference claim based on circumstantial evidence using the *McDonnell–Douglas* burden-shifting approach. *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012). To prevail on his FMLA interference claim, Wallace must prove that: (1) he was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) he was entitled to leave under the FMLA, (4) he gave the employer notice of his intention to take leave, and (5) the employer denied the employee FMLA benefits to which he was entitled. *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (citation omitted)). The claim does not require the employee to show that the employer intended to interfere. *See Arban v. West Pub. Co.*, 345 F.3d 390, 401 (6th Cir. 2003) ("Because the issue is the right to an entitlement, the employee is due the

benefit if the statutory requirements are satisfied, regardless of the intent of the employer.") Furthermore, "[t]he burden of proof at the prima facie stage is minimal." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012)

Wallace makes two FMLA interference claims. First, he argues that the absences on April 18, 19, and 21 were held against him even though he gave Sparrow notice of his intent to take FMLA leave. Wallace asserts that Sparrow's documentation shows that he received Level 1, Level 2, and Level 3 disciplines for each of these days, and that Sparrow treated the April 21 absence as an "attendance violation" that factored into its ultimate decision to terminate him.

Sparrow's FMLA leave policy requires an employee to submit a written leave of absence request before a leave of absence is granted. The record shows that Sparrow issued disciplines for the April 18 and 19 absences before it received Dr. Emerson's written request for medical leave on April 28, 2015, and that after receiving Dr. Emerson's written request, Sparrow rescinded the disciplinary actions. Wallace acknowledged at deposition that his supervisor instructed him not to sign the two discipline reports.

Wallace relies on a January 26, 2016 disciplinary report that lists the April 21 absence as a Level 3 discipline under the "previous disciplinary action(s)" section of the form. (R. 19-23, PID 393.) However, the form also lists four absences—January 20, 21, 23, 24—as the Level 1 through 4 disciplines. As the district court aptly noted, "If the April 21, 2015, date was used by Sparrow Hospital as Wallace's Level 3 discipline, then the January 20, 2016, absence would constitute Wallace's Level 4 discipline. It was not; the January 20 absence is identified as Wallace's Level 1 discipline." (R. 33, PID 728-29.) Although Sparrow listed April 21 as a "previous disciplinary action," there is no evidence that Sparrow ever acted on April 21 as a subject of discipline after approving Wallace for FMLA leave.

Second, Wallace argues that Sparrow interfered with his FMLA rights by posting and filling his position in the middle of his covered leave. Wallace argues that Lea Anne Jacobs stated in a memorandum that his FMLA leave ran all the way to August 16, 2015, and asserts, "If we take Jacobs' view as correct, Sparrow interfered with Wallace's right to leave by filling his position in the middle of his leave entitlement." (Appellant Br. at 32.) But Jacobs's memorandum was referring to the 120-day leave period, not the 12-week FMLA period. There is no support for Wallace's claim that Jacobs, or any other Sparrow employee, thought that his FMLA leave lasted until August 16, 2015.

Sparrow claims that Wallace ran out of FMLA leave on May 5, 2015. Sparrow calculates Wallace's FMLA entitlement by counting all of Wallace's prior FMLA leave during the preceding twelve months. Wallace used 35 days of full-time leave for his septic bursitis between July 4 and August 8, 2014, and 22 days of full-time leave for his PTSD between April 14 and May 5, 2015. To reach his FMLA limit of twelve weeks, or 84 days, Wallace had to have used 27 additional FMLA leave days to care for his step-daughter between May 20 and November 16, 2014. Wallace testified that he took off "a lot" of days of his intermittent FMLA leave and does not contend that he took fewer than 27 days during this period. Still, Sparrow has not submitted records supporting the number of intermittent leave days used.

Wallace's argument fails, however, even if we ignore the intermittent leave days taken. Wallace took five weeks for his bursitis FMLA, leaving seven additional weeks for his PTSD FMLA. Seven weeks from April 14 is June 2, 2015. Thus, Wallace has not shown he was denied FMLA leave to which he was entitled.

## B. FMLA Retaliation

To establish a prima facie case of retaliation under the FMLA, a plaintiff must show that: (1) he was engaged in a statutorily protected activity; (2) the employer knew that he was exercising his FMLA rights; (3) he suffered an adverse employment action; and (4) a causal connection existed between the protected FMLA activity and the adverse employment action. *Donald*, 667 F.3d at 761. "The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).

Wallace alleges Sparrow retaliated against him in two ways. First, Wallace claims that Sparrow posted and filled his position on July 10, 2015, which was in the middle of his FMLA leave. Second, Wallace asserts that Sparrow terminated his employment on January 26 based on days that were covered by his FMLA leave. For the reasons discussed in the FMLA interference section, both claims fail.

The record does not support either of Wallace's claims. First, Sparrow did not post his position while he was still on FMLA leave. Second, there is no genuine dispute regarding whether Sparrow retaliated against Wallace by terminating his employment for taking his FMLA leave.

Sparrow asserts that it terminated Wallace for the legitimate, non-retaliatory reason that he missed too many days of work, with twelve absence occurrences in total. Sparrow asserts that Wallace had unexcused absences on 3/25/15, 4/1/15, 4/2/15, 4/6/15, 4/7/15, 4/8/15, 4/9/15, 1/20/16, 1/21/16, 1/22/16, 1/23/16, and 1/24/16. On January 24, 2016, the day of Wallace's twelfth absence, Sparrow terminated his employment.

Wallace claims that he never reached twelve unexcused absences. He asserts that mid-litigation Sparrow fabricated an absence occurrence for January 22 to justify his termination because he had only eleven unexcused absences.[4] Wallace points to a January 25, 2016 email from Kurt Batteen to Alyssa Gruber, Todd Cassidy, and Jerry Dumond that lists Wallace's unexcused absences but does not include January 22. Wallace also points to a disciplinary report from the same date that lists Wallace's absence occurrences but makes no mention of a January 22 absence and lists April 21 as a previous disciplinary level. Sparrow counters that Batteen accidentally omitted January 22 from the email listing Wallace's absence occurrences and Batteen's list was then "copied onto a disciplinary report for Wallace, showing (correctly) that Wallace became eligible for discharge when he accrued an unexcused absence on January 24, 2016, but omitting (inadvertently) Wallace's unexcused absence on January 22, 2016." (Appellee Br. at 10-11 (citing R. 19-22, PID 390; 19-1, PID 292).)

Ordinarily, this type of dispute would present a question of fact. Under the circumstances here, however, there is no genuine dispute. Wallace admits that he did not work on January 22; he argues that he was not scheduled to work that day. Wallace is correct that the January 22 date was not included in the two documents. However, Sparrow produced contemporaneously created business records showing that Wallace was scheduled to work on January 22. Additionally, Sparrow produced records showing that on January 25, 2016, administrative assistant Alyssa Gruber sent Wallace's attendance records to Batteen. Those records show that Wallace had an absence occurrence listed for January 22. The first record is a list that includes Wallace's absence on January 22 with the notation that he called in sick. The second shows January 22 as a "call in," an unexcused absence. That same day, Batteen sent the email listing January 20, 21, 23, and 24

---

[4] This argument actually appears in the FMLA interference section of Wallace's brief, but we address it here.

as absence occurrences with Level 1 through 4 disciplines, but omitting January 22 from the list. Sparrow then used Batteen's email to generate Wallace's January 26, 2016 Disciplinary Report. Although Batteen erroneously omitted January 22 from the email—an oversight also included in the disciplinary report—the underlying records show that there *was* an absence occurrence on the 22nd.

Wallace argues that this evidence at best shows that he had an absence on January 22, but Sparrow did not treat it as an absence occurrence. Wallace notes that December 16 is included on one of the lists as an unscheduled call-in, but was not counted as an unexcused absence. But that list includes other absences that were not counted as absence occurrences. The second list, on which the December 16 date does not appear, is the list of absence occurrences. Without more, and in the face of Sparrow's evidence, the district court did not err in concluding that, "Wallace's confusion and poor memory are not sufficient to create a genuine issue of material fact," regarding the January 22 absence. (R. 33, PID 724.)

Wallace's claim that January 22 was not an absence occurrence relies on errors in the paperwork, and, apart from this argument, he does not respond to Sparrow's legitimate, non-discriminatory reason for terminating his employment—the twelve unexcused absences.

## II. ADA and PWDCRA Claims

"The ADA makes it unlawful for an employer to 'discriminate against a qualified individual on the basis of disability.'" *Keith v. Cnty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013) (quoting 42 U.S.C. § 12112(a)). The PWDCRA "substantially mirrors the ADA," *Donald*, 667 F.3d at 764, and the "resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim." *Id.* (citing *Cotter v. Ajilon Svcs., Inc.*, 287 F.3d 593, 597

(6th Cir. 2002)). Accordingly, we review Wallace's claims under the ADA and the PWDCRA together.

### A. ADA and PWDCRA Disability

We apply the *McDonnell Douglas* burden-shifting test when a plaintiff seeks to establish disability discrimination under the ADA and the PWDCRA through circumstantial evidence. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008). To state a prima facie case of disability discrimination, a plaintiff must show that (1) he is disabled or his employer regarded him as disabled, (2) he is otherwise qualified to perform the essential functions of a position, with or without accommodation, and (3) he suffered an adverse employment action because of his disability. *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014). The plaintiff must prove that his disability was the "but-for" cause of his termination. *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc). A plaintiff's burden in establishing a prima facie case is not onerous and is easily met. *Hollins v. Atlantic Co.*, 188 F.3d 652, 659 (6th Cir. 1999). If a plaintiff establishes a prima facie case, the burden shifts to the defendant to show a legitimate, nondiscriminatory reason for the adverse employment action. *Talley v. Family Dollar Stores of Ohio, Inc.,* 542 F.3d 1099, 1105 (6th Cir. 2008). If the defendant makes that showing, then the burden shifts back to the plaintiff to show by a preponderance of the evidence that the defendant's proffered reason is merely a pretext for discrimination. *Id.* To establish pretext, the plaintiff is required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate

his discharge, or (3) that the proffered reasons were insufficient to motivate discharge. *Coomer v. Bethesda Hospital, Inc.*, 370 F.3d 499, 511 (6th Cir. 2004) (citation omitted).

Sparrow argues that Wallace failed to make a prima facie discrimination claim because it never took any adverse action against him because of his disability, and there is no causal connection between any action and Wallace's protected status because Sparrow's actions were based on legitimate, non-discriminatory reasons.

Wallace argues that Sparrow took three adverse actions against him: (1) on July 10, 2015, while he was on medical leave, Sparrow posted and filled his security position and placed him on layoff status; (2) Sparrow failed to re-hire him after his physician cleared him to return, and instead hired several non-disabled persons for security officer positions ahead of him during this period of time; and (3) when Sparrow finally re-hired him, he was subjected to "heightened scrutiny" by constant on-the-job monitoring by other guards.

We assume arguendo that Wallace established a prima facie case and consider the remaining parts of the *McDonnell Douglas* analysis: whether Sparrow has presented a legitimate, non-discriminatory reason for its actions, and if so, whether Wallace has presented evidence of pretext.

1. *Wallace cannot show that Sparrow's decision to post and fill Wallace's position on July 10 was pretext for discrimination*

Wallace claims that he experienced a discriminatory adverse employment event when Sparrow hired his replacement on July 10, more than a month before he claims his leave expired. Sparrow responds that it filled the position because Wallace had exceeded the 120-day period allowed by Leave of Absence policy.

The record is clear that Wallace was unable to return to work within the 120-day window, and Sparrow was not required to hold his position open after the window closed. Wallace was on

full-time medical leave for his septic bursitis from July 4 to August 8, 2014, a total of 35 days. Eight months later, on April 14, 2015, Wallace again took medical leave to address his PTSD. Thus, at the start of Wallace's leave for PTSD, and not counting any intermittent leave taken to care for his step-daughter between May 20 and November 6, 2014, Wallace had 85 days remaining under the Leave of Absence Policy. Those 85 days took Wallace to July 6, four days before his position was posted and filled on July 10, and more than a month before he was cleared to return to work on August 16.

Wallace again relies on Lea Ann Jacobs's memo, stating that Wallace's leave would expire on August 11, 2015. Sparrow argues that Jacobs made a mistake because "[t]his calculation failed to take into account Wallace's prior leave taken" in 2014 and that Wallace "admitted that he never actually received this memorandum." (Appellee Br. at 41.) The Jacobs memo does not create a genuine issue of material fact because there is no claim that Wallace relied on this memo; Wallace does not challenge that he took the earlier leave days; and the Leave of Absence Policy is clear that Sparrow uses a rolling 365-day period, not the employee's anniversary date.

2. *Wallace cannot show that Sparrow's treatment of other security officers establishes pretext*

Wallace argues that there were other similarly situated security officers who were treated more favorably than he was. First, Wallace claims that he was aware of "other security officers who reached the 120-day medical leave threshold, but were not laid off or had their positions filled." (Appellant's Br. at 13.) Second, Wallace contends that he "observed that Sparrow hired several non-disabled persons for security officer positions ahead of him" while he was on layoff status. (*Id.* at 41-42.)

Sparrow responds that Wallace failed to identify any similarly situated Sparrow employees outside his protected class who were treated more favorably. Sparrow notes that Wallace testified

that "exactly *one* security officer reached 120 days of medical leave without being placed on layoff status" but "this officer, like him, was on a several-month leave 'for psychological issues.'" (Appellee Br. at 20 (citing R. 19-1, PID 285).) Additionally, Wallace offered no evidence supporting his assertion that Sparrow hired security officers while he was on layoff status; in contrast, Sparrow points to an affidavit saying that it did not.

Wallace has not shown pretext. First, Wallace cannot establish pretext by showing that another employee who also had mental-health issues was treated differently. *Clayton v. Meijer*, 281 F.3d 605, 610 (6th Cir. 2002) (finding that the district court "correctly held that the plaintiff must prove that he was either replaced by a person outside of the protected class or show that similarly situated, non-protected employees were treated more favorably."). Further, Wallace has not shown that the other security officer exceeded the 120-day leave policy but still had her job held open for her. Wallace testified that the officer was gone for seven to eight months in 2011, but continued to work at Sparrow. However, Wallace also testified that he did not know if the officer was placed on layoff status and given preferred consideration for open positions. Apart from this testimony, there is no evidence in the record supporting Wallace's claim that any other security officer exceeded the 120-day leave period and then immediately resumed work when able without being placed on layoff status.

Second, Wallace alleges that during his layoff period, Sparrow hired another security officer, initially for a part-time position but later full-time. He testified that the security officer, Cynthia Gorton, told him that she was hired in August of 2015, a month after his post had been filled and after he was able to return to work. The district court correctly observed that Wallace could not rely on his own deposition statements to create a genuine issue of fact because his account of Gorton's statements would be inadmissible hearsay at trial. Sparrow, on the other hand,

relied on the affidavit of Todd Cassiday, manager of Security and Parking, stating that "[n]o security officers were hired during the period between when Mr. Wallace was placed on layoff status in August 2015 and when he was rehired in December 2015." (R. 19-2, PID 301.)

> 3. *Wallace cannot show that Sparrow's "heightened scrutiny" of his job performance was evidence of pretext*

Wallace claims that when Sparrow finally re-hired him, it subjected him to "heightened scrutiny" by assigning him "a second security officer to babysit him at all times", (Appellant Br. at 42) and that Sparrow induced Wallace's co-workers "to produce written statements about Wallace's supposedly 'erratic' (ADHD-related) behavior which were then used to justify taking him off work." (*Id.*) Wallace asserts that "this was a common tactic his superiors at Sparrow used when they had someone in mind they wanted to terminate." (*Id.*)

Sparrow responds that Wallace had a history of concerning behavior, including his comment that he "will probably snap and hurt someone or get fired," and his concerns about attending the mandatory training on submission because he was worried he might hurt one of his coworkers. (Appellee Br. at 18.) Sparrow asserts that it "took these concerns seriously and responded appropriately to determine whether [Wallace] could perform the essential functions of his job." (*Id.*)

There is no question that Wallace was subjected to heightened scrutiny after his return based on Sparrow's perception of his mental health. The question is whether that scrutiny was discriminatory.

The record shows that during his first week back at work in December 2015, Sparrow became concerned about Wallace's mental health based on co-worker reports. For example, one employee reported that Wallace seemed "extremely agitated" so he engaged him in conversation. Wallace told the employee that his doctor had not given him Prozac "so he will probably snap and

hurt someone or get fired" and that he would "not know the consequences of his actions until after he snapped and calmed down." (R. 19-18, PID 376.) The employee observed Wallace "clenching his jaw, bouncing his knees up and down while sitting, and licking his lips in an odd way"; the employee also said "[i]t made me very nervous to be around him and it seemed like the more calls I dispatched him to, the more agitated he became, so I stopped dispatching him to calls. I don't want anyone to get hurt because of his state." (*Id.*) Sparrow asserts that because of its concerns it assigned a person to work with Wallace. Although heightened scrutiny can be an adverse action, Wallace has not shown that Sparrow's actions were pretext for discrimination. He does not challenge the record evidence showing his colleagues' concerns. Nor has he shown that Sparrow's concerns were based on stereotypes about people with PTSD. The record shows that Sparrow's choice to assign an officer to work with Wallace was motivated by real, rather than imagined, concerns about Wallace's ongoing mental-health issues.

## B. Retaliation

We analyze a retaliation claim based on circumstantial evidence using the *McDonnell–Douglas* burden-shifting approach. *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013). The plaintiff bears the initial burden to establish a prima facie case of retaliation, which requires a showing that (1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse action. *Id.* Establishing a prima facie case of retaliation is a "low hurdle." *Gribcheck v. Runyon*, 245 F.3d 547, 551 (6th Cir. 2001). To rebut a prima facie case, the defendant must show that it had a legitimate non-discriminatory reason for the adverse action. *Id.* And if the defendant can

do so, the burden shifts back to the plaintiff to prove "by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination." *Id.*

Here again, we assume that Wallace has met the low threshold of establishing a prima face case. *Id; Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) ("The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met.").

Wallace asserts that his employment was terminated in retaliation for requesting support-group accommodations, noting that Donovan cancelled the meeting to discuss Wallace's proposed accommodations at the last minute and that Wallace's request was pending at the time he was fired. Wallace argues that "[g]iven Donovan's evasive behavior; cancelling the meeting for some imaginary 'conflict' she could never identify to the Court, a jury could conclude that Wallace was terminated to avoid providing the accommodations he requested." (Appellant Br. at 43.)

Wallace has not rebutted Sparrow's proffered legitimate reason for firing him—missing too many days of work. The record shows, and Wallace has not successfully countered, that he had twelve absence occurrences between his anniversary date and January 2016. There is no evidence in the record that Sparrow fired Wallace because he requested a support group as an accommodation for his disability. *See Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc) (stating that the ADA requires plaintiff to show that his disability was a but-for cause of the adverse action). We recognize that Wallace has shown temporal proximity between his request for accommodation and his discharge; however, temporal proximity alone is not sufficient in the face of Sparrow's contemporaneous records showing a violation of its attendance policy. *See Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010) (noting that "temporal proximity, standing alone, is not enough to establish a causal connection for a retaliation claim").

## <u>CONCLUSION</u>

Because there is no genuine dispute of material fact regarding Wallace's claims under the ADA, PWDCRA, and FMLA, we **AFFIRM**.