**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 14a0132n.06

Case No. 13-1265

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**

Feb 13, 2014

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| Elizabeth Mukoya Khamati, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| Secretary of the Department of the Treasury, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

---

BEFORE: SUHRHEINRICH, SILER, and KETHLEDGE, Circuit Judges.

**SILER,** Circuit Judge. Elizabeth Khamati brought suit against her former employer, the Department of the Treasury (the "DOT"), alleging discrimination on the basis of her national origin, retaliation for engaging in a protected activity, and hostile work environment. She now appeals the district court's grant of summary judgment in favor of the DOT on each claim. For the reasons stated below, we **AFFIRM** the district court's rulings.

## BACKGROUND

In 1983, Khamati, an African-American woman of Kenyan descent, began working in a clerical position for the Internal Revenue Service, a DOT agency. The DOT eventually promoted her to group manager in 2000. In that capacity, Khamati was responsible for ensuring that her subordinates handled taxpayer cases efficiently. The DOT evaluates group manager

performance based, in part, on the number of aging cases within the group. Large aging case numbers could indicate that a group manager failed to properly supervise her subordinates' work habits or efficiency levels. The DOT terminated Khamati's employment in 2010, for improperly closing cases to manipulate her aging case numbers and for falsely denying she had done so.

During her more than 25 years of employment with the DOT, Khamati's relationships with the DOT and its employees were turbulent. For example, she filed numerous grievances complaining about various working conditions. In 2000, she filed her first Equal Employment Opportunity Commission ("EEOC") discrimination claim against two supervisors, which the parties eventually settled. In 2004, the DOT assigned Khamati to work at the Clinton Township/Mt. Clemons office. It was apparent that neither Khamati nor the DOT employees at Mt. Clemens were particularly pleased with the assignment. Khamati knew the Mt. Clemens office to have performance issues, and Mt. Clemens employees held a union meeting and demonstration protesting her assignment to their office. The following year, Khamati's supervisor gave her a "minimally successful" performance evaluation, and Khamati filed a grievance in response. Khamati filed her second EEOC complaint against three supervisors that year, alleging discrimination. This resulted in a lawsuit, but the parties eventually settled.

Khamati's employment relationship with the DOT became more contentious in 2007. Following a presentation at the Mt. Clements office concerning an event unrelated to Khamati, Tony Coulter, Khamati's supervisor, Dretha Barham, supervisor to Coulter, and other DOT officers invited Mt. Clemens employees to meet with them individually to discuss any ongoing problems within the office. During these meetings, a number of issues with Khamati surfaced. In particular, employees reported that Khamati publicly disclosed an employee's illness and

commented that the illness appeared fake, refused to grant an employee leave, instructed employees to prematurely close cases, and generated a toxic environment.

Coulter began investigating these matters and issued a memorandum stripping Khamati of her managerial responsibilities and reassigning her to another office, a move he initially characterized as temporary. Although Khamati did not have the opportunity to hear or respond to all of the accusations against her, she learned that the reasons for reassignment were twelve improper case closures, her remarks regarding an employee's illness, and her demands that employees stay late. She refuted these charges in a rebuttal memorandum. Khamati then filed her third EEOC claim alleging that Coulter discriminated against her, but later withdrew it. Shortly thereafter, Khamati reported to her new post at the Detroit Commuting Center; her office was in a cubicle isolated from other revenue officers.

As a result of the allegations of Coulter and other employees rebuking her managerial performance, the Treasury Inspector General for Tax Administration (the "TIGTA") also investigated Khamati, focusing on the twelve improper case closures Coulter identified. The TIGTA questioned Khamati about these cases, and she maintained that they were not closed inappropriately, although she admitted that some could have been handled differently. The TIGTA determined only that she *may* have improperly closed cases.

After these investigations, Barham sent Khamati a Notice of Proposed Adverse Action, which advised Khamati that Barham proposed her removal from employment with the DOT for improperly closing twelve cases, falsely stating to the TIGTA that she did not improperly close any of these cases, and other aggravating factors, such as inappropriately discussing her subordinate's illness and forcing subordinates to stay late. In 2010, Khamati received a letter of termination signed by David Alito, Barham's supervisor. Alito had reviewed the twelve cases

that Khamati allegedly closed prematurely and found that she improperly handled only five of them.  He then detailed the reasons for her termination, which generally followed those Barham provided in her Notice of Proposed Adverse Action.

Khamati sued, alleging discrimination based on her national origin, retaliation for filing grievances and EEOC complaints, and hostile work environment.  The DOT filed a motion for summary judgment.  The district court heard arguments on the motion and granted summary judgment to the DOT on all of Khamati's claims.  Khamati presents four issues on appeal.

## STANDARD OF REVIEW

We review the granting of summary judgment *de novo*.  *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013).  The moving party bears the initial burden of showing the absence of a genuine issue of disputed fact.  *Wimbush v. Wyeth*, 619 F.3d 632, 636 (6th Cir. 2010).  If satisfied, the burden then shifts back to the nonmoving party to set forth "specific facts showing that there is a *genuine issue for trial*."  *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting FED. R. CIV. P. 56(e)).  We construe the facts and draw all reasonable inferences in favor of Khamati.  *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007).

## ANALYSIS

### A.  Application of Summary Judgment Standards

The district court orally disposed of this entire case with a record of over a thousand pages.  We have previously observed that "[t]his reviewing court, and more importantly, the parties, are much better served when, as is the custom in this circuit, the district court prepares a written opinion explaining its ruling and the reasoning, factual and legal, in support, especially when the ruling disposes of the case in a final judgment."  *Peck v. Bridgeport Machs., Inc.*, 237

F.3d 614, 617 (6th Cir. 2001). Khamati assigns two general claims of error to the district court's rulings, which stem from problems attendant with granting summary judgment from the bench without presenting any accompanying written findings. *See, e.g.*, *Terry Bar Sales Agency, Inc. v. All-Lock Co., Inc.*, 96 F.3d 174, 178 (6th Cir. 1996).

During the course of the summary judgment hearing, the district court frequently requested that Khamati point to specific pages in the dense record that supported the pertinent elements of each claim. These requests followed the district court's frankness in expressing that it failed to review the entire record prior to the hearing, stating, "I have to admit candidly that I have not read the three, six, eight inches of exhibits, nor I hope has my law clerk." Khamati first argues that this statement illustrates that the court failed to review all the evidence she presented, which in turn prevented a finding that genuine disputes existed. However, the court's acknowledgement that it failed to review the record prior to the hearing alone does not render its summary judgment grant erroneous.

The district court is not required to search the entire record to find that genuine disputes of material fact exist. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). In fact, the federal rules squarely place this burden on the party seeking to prove the existence of the disputed fact, requiring that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." FED. R. CIV. P. 56(c)(1)(A). Here, Khamati cited to the record only twice in her analysis section of her response brief. One of these cites instructed, "*See* exhibits." Khamati's perfunctory citations therefore temper the effects of the district court's cursory treatment of the record. Further, statements made during the hearing indicate that the district court had reviewed Khamati's brief responding to the motion for summary judgment and some of the record. The court permitted, and even

encouraged, Khamati to present any evidence to support her claims, explaining that she could have as much time as necessary to find the citations to the record. In sum, the district court's revelation that it did not review the entire record did not prevent it from finding that factual disputes existed and does not constitute reversible error.

Second, Khamati argues that the district court failed to view the facts and draw inferences in her favor. *Matsushita Electric Indus. Co.*, 475 U.S. at 587-88. She highlights one statement the district court made at the summary judgment hearing in support. In analyzing the retaliation claim, the district court stated that the adverse action element of her retaliation claim "sounds like it might be retaliation for being a stern task master." This statement does not prove that the district court refused to view the facts favorably to Khamati, but rather shows the district court's attempt to summarize the evidence Khamati presented to the court.

At the heart of Khamati's general challenges to the district court's review of her case is her contention that it did not appropriately examine and rely on the record in reaching its conclusions. The other three issues presented for appeal envelop this argument and are addressed in the sections that follow.

## B. Discrimination

Khamati claims that the DOT subjected her to an adverse employment action—that is, removal from her employment because of her national origin. To establish discrimination based on national origin, we follow the *McDonnell Douglas* framework when the plaintiff presents circumstantial rather than direct evidence of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 526 (1993). Under *McDonnell Douglas*, the plaintiff bears the initial burden of proving a *prima facie* case of discrimination. *Tex Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). The district court found that Khamati could not meet this initial burden.

### a. *Prima Facie* Case

To prove a *prima facie* case for national origin discrimination, Khamati "must show that: (1) [s]he is a member of a protected class; (2) [s]he was terminated; (3) [s]he was qualified for the position; and (4) [s]he was replaced by a person outside a protected class or was treated differently than a similarly-situated, non-protected employee." *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 501 (6th Cir. 2007). For purposes of the motion for summary judgment, the DOT conceded the first three elements.

The fourth prong of the *prima facie* case mandates that a plaintiff must first identify a similarly-situated individual and then show that the individual received more favorable treatment under comparable circumstances. "The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Rather, to be sufficiently similarly-situated, Khamati must show that she and the employee with whom she seeks to compare herself are "similar in 'all of the *relevant* aspects.'" *Id.* (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). District courts are to make "independent determination[s] as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Id.* For example, in *Mitchell v. Toledo Hospital*, we considered the relevant aspects to be operating under the same supervisor, working under the same standards, and engaging "in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." 964 F.2d 577, 583 (6th Cir. 1992).

In her response to the DOT's motion for summary judgment, Khamati simply asserted that she was "treated unlike any other group manager," that she had "ample evidence that she

was treated differently than other group managers," and that "there is evidence of more favorable treatment of similarly situated co-workers, the other group managers in this area," although she failed to highlight any such evidence. At the summary judgment hearing, the court pressed Khamati to provide evidence of the other similarly-situated employees. She first named four people, including Frank Poma and Lisa Perry. After a lengthy discussion, Khamati's counsel finally asserted that Perry was the similarly-situated employee. However, because Khamati never asked Barham or Coulter why Perry was not disciplined, the court found that Khamati failed to prove the similarly-situated element and granted summary judgment on the claim.

Khamati argues that the district court erred in this conclusion, explaining that Poma, also a group manager at Mt. Clemens, and Perry, who replaced Khamati as group manager days after her reassignment, both closed cases improperly without punishment. The DOT admits that Poma and Perry potentially improperly closed cases and the TIGTA investigated both employees, but argues that they were not sufficiently similar to Khamati. According to the DOT, the accusations against Poma involved improper queuing of cases, rather than improper closing of cases, and no one accused him of lying to the TIGTA. Perry, an African-American woman,[1] had been accused of improper case closures, but, unlike the veteran Khamati, she was new to the position when the purported improper case closures took place. Any improper case closures under Perry's management did not rise to the level of egregiousness as those under Khamati.

The district court erred in finding that Khamati failed to establish the fourth element of a *prima facie* case for discrimination. Khamati presented some evidence that Poma and Perry were similarly situated. In a memorandum Khamati submitted to Barham replying to the Notice

---

[1] This is a national origin discrimination case. Khamati was born in Kenya and spoke with a Kenyan accent. The fact that Khamati and Perry are both African-American women does not necessarily place them in the same protected class for purposes of this case. The DOT does not contest this conclusion.

of Proposed Adverse Action, Khamati stated that Poma admittedly queued the cases assigned to trainees, because they would become aging and inflate his overage numbers. She noted that the TIGTA investigated this matter, but he never received discipline for the conduct. Barham's deposition reveals that the TIGTA also investigated an allegation that Perry inappropriately closed files. Instead of reprimanding her for these actions, Barham decided to counsel Perry. Barham explained that she had discretion in what type of punishment to mete out depending on the circumstances of the situation, and Perry's situation only required counseling.

This evidence supports the conclusion that at least two individuals may have been similarly situated to Khamati. Each acted as group manager under the same supervisors and the same IRS performance standards. However, the evidence is unclear as to whether the context in which Poma and Perry inappropriately handled cases demonstrated differentiating or mitigating circumstances sufficient to justify the disparate treatment from the DOT. The district court made no finding as to the relevancy of particular aspects of their employment status. It is entirely possible that queuing cases may be less flagrant than closing cases, although both result in improved numbers for group managers and could be used to manipulate aging case numbers. Similarly, one's inexperience in a position could allay culpability for improper closures, but reasonable minds could also consider improper closures of taxpayer cases so nefarious generally as to warrant punishment regardless of experience in the position.

While the DOT presents a compelling argument that Khamati failed to meet her burden to prove a *prima facie* case of national origin discrimination, we have held that "[t]he prima facie requirement for making a Title VII claim is not onerous, and poses a burden easily met." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (internal citations and quotation marks omitted). The evidence supporting Khamati's *prima facie* case existed within the record.

She referenced some of the relevant exhibits, albeit the incorrect pages, in arguments before the district court. Khamati presented a genuine issue of disputed fact as to the existence of similarly-situated individuals outside her protected class that received more favorable treatment, though barely, such that the district court's ruling to the contrary was erroneous.

### b. Pretext

According to the *McDonnell Douglas* burden-shifting scheme, if the plaintiff proves a *prima facie* case, the defendant must then provide legitimate, non-discriminatory reasons for the adverse employment action; if the defendant is successful in proffering such a reason, the burden shifts back to the plaintiff to prove that the legitimate reason was pretext for discrimination. *Burdine*, 450 U.S. at 252. The DOT showed that it terminated Khamati's employment for engaging in conduct unbecoming of a management official, because she improperly closed cases and made false or misleading statements about the case closures during the TIGTA investigation. The district court did not specifically rule that Khamati failed to show pretext, but during the summary judgment hearing, it cast doubt on her ability to do so.

To show that a defendant's proffered legitimate, non-discriminatory reason for termination was pretextual, the plaintiff must establish that the reason had no basis in fact, did not actually motivate the termination, or was insufficient to warrant termination. *Abdulnour*, 502 F.3d at 502. Khamati argues that the reasons had no basis in fact. In rebuttal letters, she explained that the cases the DOT officials flagged had been closed in accordance with IRS policy or practice, even though one of them could have admittedly been handled better. She argues that the proffered reasons for her dismissal were therefore false or unworthy of belief. However, to show pretext on the grounds that the proffered reason for termination had no basis in fact, Khamati "must allege more than a dispute over the facts upon which [her] discharge was

based. [Sh]e must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001). To show an honest belief, "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).

Khamati has failed to satisfy her burden of showing pretext. First, Khamati's main argument is that disputes of material fact exist as to whether she improperly closed cases, but more is required. *See Braithwaite*, 258 F.3d at 493-94. Second, the nondiscriminatory reasons proffered by Alito and Barham, the two supervisors with decision-making authority over Khamati's removal, were based on fact. Alito's termination letter shows that he relied on the particularized facts at hand in determining that Khamati should be removed: he examined, and at times repeated verbatim, the findings and conclusions as to the improper case closures presented in Coulter's reassignment letter, the TIGTA investigation report, and Barham's Notice of Proposed Adverse Action; at the same time, he made independent conclusions that differed from those of Coulter, the TIGTA, and Barham. Barham engaged in a thorough analysis of the twelve improper case closures and issued detailed opinions about the appropriateness of those closures based on her knowledge of internal rules and policies. The DOT showed that Barham and Alito acted with an honest belief that Khamati improperly closed at least five cases, and Khamati presents no persuasive argument to the contrary.

Because Khamati offered no other pretext arguments, we affirm the judgment of the district court, but on pretext grounds rather than for Khamati's failure to show that a similarly-situated individual received more favorable treatment.

## C. Retaliation

We also apply the *McDonnell Douglas* burden-shifting framework to retaliation claims. *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). In order to carry her initial burden to establish a *prima facie* case for retaliation, Khamati must establish that: "(1) [s]he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Id.* Khamati argues that the DOT retaliated against her for submitting grievances and filing EEOC complaints. The DOT concedes that based on those activities, it can only contest the fourth prong of the *prima facie* case for retaliation.

> To satisfy the fourth element of a *prima facie* case for retaliation,
>
> a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action. . . . Proof of temporal proximity between the protected activity and the adverse employment action, coupled with other indicia of retaliatory conduct, may give rise to a finding of a causal connection.

*Id.* (internal citations and quotation marks omitted). Khamati first argues that the temporal proximity between her 2007 EEOC suit against the DOT and her reassignment to the Detroit office shortly thereafter evidenced retaliation for engaging in that activity, but the adverse employment action presently before us is Khamati's termination. Often throughout her brief, Khamati attempts to link her grievances and complaints to her reassignment and later dismissal, as if the latter two actions constituted a unified decision. However, her reassignment in 2007 is distinct, both temporally and contextually, from her removal in 2010. She pursued her retaliation claim on the basis of her removal, not her transfer, through the proper EEOC channels to exhaust her administrative remedies; the timing of Khamati's reassignment is inapposite to this claim.

The temporal proximity between her 2007 EEOC complaint against Coulter and her 2010 termination is too strained to provide support for the causation element.

Khamati highlights other evidence in support of the causal connection prong. Coulter, in a grievance filed with the DOT on or around November 9, 2007, stated that he "removed an under-performing manager who fights back via EEO complaints and [was] seeking the return of the manager to [lower] ranks." Assuming Khamati is the subject of this sentence, Coulter's statement evidences his motivation for reassignment, not for termination, as he explicitly states that he seeks her demotion. This may support a similar claim for retaliation on the basis of her reassignment, but does not support the termination claim. Moreover, Coulter issued this statement in late 2007, and Alito terminated Khamati's employment in 2010, so the temporal and causal links between the two are attenuated.

Khamati further argues that the record shows that DOT employees targeted her before she arrived at Mt. Clemens, as evidenced in the 2004 union protestations against her assignment to the post. Khamati has alleged but not shown that union dissatisfaction with her assignment to Mt. Clemens related to her termination almost six years later. The union members' complaints about Khamati to Coulter and Barham did not lead to the decision to remove her from employment. At most, results of the investigation into these complaints were merely aggravating factors that supported the termination decision.

Khamati cannot show a causal link between her protected activities and her termination. Accordingly, she failed to carry her initial burden in the *McDonnell Douglas* framework, and the district court properly dismissed her retaliation claim.

### D. Hostile Work Environment

It appears from her complaint and quick mention in her appellate brief that Khamati brought claims for both discriminatory and retaliatory hostile work environment, although the district court seemed to only consider the former. Both claims require application of the *McDonnell Douglas* burden-shifting scheme where the plaintiff presents circumstantial evidence of wrongs. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009). To survive summary judgment on a discriminatory hostile work environment claim, Khamati must show that 1) she was a member of a protected class; 2) she was subjected to unwelcomed discriminatory harassment; 3) the harassment was based on her national origin; 4) "[t]he harassment had the effect of unreasonably interfering with [her] work performance by creating an intimidating, hostile, or offensive work environment; and 5) the existence of employer liability." *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).

We consider a retaliatory hostile work environment claim as a variety of retaliation. *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). Consequently, the *prima facie* elements for this claim are a modified version of those four elements recognized in a typical retaliation claim: 1) the plaintiff engaged in a protected activity; 2) the defendant knew this; 3) the defendant subjected the plaintiff to severe or pervasive retaliatory harassment; and 4) the protected activity is causally connected to the harassment. *Id.*

The touchstone of any hostile work environment claim, and the main element at issue for both hostile work environment claims presented here, is whether "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*,

477 U.S. 57, 65, 67 (1986)). We consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.

Khamati asserts that the following constitutes a hostile work environment: she was removed from her position without any opportunities to rebut the charges when she was reassigned to the Detroit office; she was isolated from other revenue officers in a cubicle; she operated for months under a TIGTA investigation that may have led to criminal charges; the DOT posted the opening for her former position at Mt. Clemens within days of her transfer; and she was ordered to read in the library. However, none of these actions, alone or cumulatively, amount to a sufficiently abusive work environment.

Reassignment to a new post and the resultant placement at a desk in a new location, including a cubicle at the end of the hall, does not render a work environment hostile. Perhaps the reassignment could be considered an adverse employment action, but her new working conditions, while less desirable, were certainly not severe or abusive enough to alter the conditions of her employment. *See Meritor Sav. Bank*, 477 U.S. at 66. The isolation is not sufficiently harassing to support a finding of a hostile work environment.

The DOT reacted naturally to reports of improper case closures by instituting an investigation into Khamati's work. That this led to a TIGTA investigation, which can in some circumstances prompt criminal prosecution, does not transform the investigation into actionable conduct. While Khamati may have felt threatened, hostile work environments must be objectively so. *Barrett*, 556 F.3d at 514. The chain of events spanning from the reports of improper case closures to the TIGTA investigation occurred as a matter of DOT policy and are reasonable when considering the employer's responsibility for handling taxpayer cases.

Moreover, the prospect of criminal prosecution is a ubiquitous threat when any entity investigates potentially illegal behavior.

The DOT's advertisement of a job opening for her former position at Mt. Clemens and its request that Khamati read in the library also did not render her work environment abusive. These actions may be aggravating for Khamati, but they are not illustrative of an insulting or intimidating work atmosphere.

In assessing a hostile work environment claim, the court will only consider those attributes of the work environment that arise from the plaintiff's protected status or performance of protected activities. *See Williams v. CSX Trans. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011). Perhaps most condemning, then, is that Khamati has failed to provide any proof beyond bare assertions of a causal connection between her Kenyan descent and her work atmosphere and any persuasive proof beyond mere speculation of a causal connection between her protected activities and her work atmosphere. Accordingly, we affirm the grant of summary judgment on the hostile work environment claims.

AFFIRMED.