NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0373n.06

Case No. 21-1392

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Sep 14, 2022
DEBORAH S. HUNT, Clerk

CHRYSTAL ROBINSON,

    Plaintiff-Appellant,

v.

QUICKEN LOANS, LLC, f/k/a Quicken Loans, Inc.,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

Before: CLAY, DONALD, and NALBANDIAN, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** Plaintiff Chrystal Robinson, an African American woman, was terminated from her role as a business analyst with Defendant Quicken Loans, Inc. ("Quicken Loans").[1] Asserting that her treatment and eventual termination were based on her race and sex, Robinson brought claims against Quicken Loans under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* After a period of discovery, Quicken Loans filed a motion for summary judgment. The district court granted summary judgment in favor of Quicken Loans, finding that Robinson failed to establish a prima facie case of discrimination on her race or gender discrimination claims and that she failed to establish a prima facie case of retaliation. For the reasons that follow, we AFFIRM the district court's grant of summary judgment.

---

[1] Quicken Loans, LLC changed its name to Rocket Mortgage, LLC on July 31, 2021. To be consistent, we refer to Appellees as Quicken Loans.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In addressing Quicken Loans' motion for summary judgment, the district court accurately and concisely summarized the parties' legal positions and the evidence offered in support of, and against, a grant of summary judgment. In its opinion and order, the district court summarized the relevant information as follows:

> Plaintiff Chrystal Robinson is an African American female. She graduated with honors from Warren Mott High School in 2010 and went on to obtain a dual degree in Business Management and Computer Information Systems in 2015.
>
> In October of 2014, [Robinson] began her employment with Defendant Quicken Loans as an intern. Quicken Loans designed its internship program to be a stepping-stone into regular placement within the organization. The company therefore encouraged its interns, including [Robinson], to explore different departments and roles during their internship so they could identify the full-time positions they were interested in joining upon graduation. Consistent with this program, [Robinson] spent her internship working as an executive administrative assistant but was given flexibility to shadow those working in several other roles. She determined the business analyst role "was the one that [she] was being pulled to most" and joined Quicken Loans full time as a business analyst in May of 2015. (*See* ECF No. 17, *Defendant's Motion*, 2; ECF No. 22-1, *Plaintiff's Deposition*, 26:4-15; 27:5-22.)
>
> When [Robinson] first started as a business analyst, she reported directly to the director of the department, Keith Elder. Those in the technology department were frequently moved around, however, and [Robinson] was transferred to a team called Web Core. Members of Web Core answered to Bridget Schiefer, the team leader. [Robinson] was familiar with Schiefer, who is also an African American female, from her time as an intern. The two had never worked together but had previously gotten along very well. [Robinson] testified at her deposition that she and Schiefer shared common ideas and participated in Quicken Loans' women empowerment and fitness group together. It was a "positive relationship." (ECF No. 22-1, *Plaintiff's Deposition*, 52:2, 53:2-13.) According to Schiefer, she and [Robinson] frequently met to discuss women empowerment activities and work. (ECF No. 17, *Defendant's Motion*, 2.) Despite the initial positive relationship, tensions quickly rose between the two once [Robinson] joined Web Core.
>
> [Robinson] testified that Schiefer told her she was opposed to allowing [Robinson] to join her team and reported her displeasure to the director when she found out about [Robinson]'s transfer. (ECF No. 22, *Plaintiff's Response*, 2.) The transfer nevertheless went through, and [Robinson] joined Web Core as the team's business analyst in October 2016. [Robinson] states there was immediate tension between herself and Schiefer though she did not know why. (*Id*. at 2-3.) Eventually, both

[Robinson] and Schiefer individually reached out to Keith Elder, the director of the department, to discuss the problems that existed between the two. The director sat down with the two women to help them find middle ground and began assigning [Robinson] tasks from virtual teams to lessen her interactions with Schiefer. This worked for a while, and the interactions between the two stopped completely when Schiefer left for maternity leave. (*Id*. at 3.)

According to [Robinson], the team did very well while Schiefer was gone due in part to [Robinson]'s increased responsibility during Schiefer's absence. (ECF No. 22-1, *Plaintiff's Deposition*, 63:5-17.) But when Schiefer returned, [Robinson] alleges she and others perceived her to be "negative and angry" and [Robinson] claims she "got the brunt of things." (*Id*. at 60:25-61:3.) At her deposition, [Robinson] speculated that Schiefer may have felt threatened by [Robinson]'s performance during her absence and feared [Robinson] would replace her. When asked how that related to her claims of discrimination, [Robinson] testified as follows:

Q: How is that related to your race?

A: Because she's a black woman and professional situation, and I am, too. And people often compare each other when you're black. . . . [T]here's often a – there can only be one, type of mentality. . . .

Q: Okay. So do you believe that it was related to your sex that she treated you this way?

A: No. I don't – no, I don't know. I don't know why. I'm basing assumptions. Do I believe it's because of my sex? I could see that. I was the only woman on the team, yeah, maybe.

Q: She was also a female; correct?

A: Yeah. But she also was and very much like me. I'm one of those females who participate well in dominantly male conversations. So like, there can't be two of us, you know. I'm just guessing, right? I'm just being facetious a little bit. . . . I think I checked a bunch of boxes she didn't want checked. . . . Age, of my race, and my – me being a woman. I do believe that in – because I know Bridget is very big on, like, pushing women up inside of I.T. So I'm very hesitant to say sex.

(*Id*. at 63:21-65:11.)

[Quicken Loans] presents an alternative view of this time period through deposition testimony and a sworn statement by Schiefer. She states [Robinson] confided in her that she was unhappy as a business analyst and she hoped to find another career path at Quicken Loans. (ECF No. 17, *Defendant's Motion*, 3.). This unhappiness, [Quicken Loans] argues, affected [Robinson]'s attitude and job performance. She "struggled to make it into the office and work full workdays, her follow-through on projects waned, and she became combative and unreceptive to any type of feedback." (*Id*. at 3.). Consistent with this argument, [Quicken Loans] attaches

[Robinson]'s 2017 annual review that notes she "achieves expectations" but suggested she "work on [her] tone and body language." (ECF No. 17-4.)

In early 2018, Schiefer gave [Robinson] a decreased workload so she would have more time to shadow others and explore different positions within the company. [Robinson], however, never applied or interviewed for any other position within Quicken Loans. (ECF No. 17, *Defendant's Motion*, 4.) Thereafter, [Quicken Loans] argues, "[Robinson's] attendance remained spotty; at times she simply did not show for work without notice [and] [s]ome teammates ceased working with [Plaintiff] because she was unreliable." (ECF No. 17-2, Declaration of Bridget Schiefer, ¶14.) Schiefer documented many of [Robinson]'s unexcused absences and late arrivals in [Robinson]'s electronic drive. (*See* ECF No. 17-5.)

In May of 2018, [Robinson] was given a verbal warning based upon the substandard quality of her work and her failure to complete assigned tasks. Schiefer followed-up on the warning with an email to [Robinson] that summarized the issues discussed, cited several specific examples of times when [Robinson] failed to meet expectations, and identified actions to be taken and resources available to [Robinson] to assist her with improving her job performance. (*See id*.) According to [Quicken Loans], [Robinson] did not agree with the verbal warning and met with her team relations specialist in an attempt to have it removed. She did not allege any discrimination during this meeting. (*See* ECF No. 17, Defendant's Motion, 4.)

Shortly thereafter, in [Robinson]'s 2018 mid-year review, Schiefer rated [Robinson] as "needs improvement" and encouraged her to "be mindful of [her] tone." (ECF No. 17-6.) Similarly, another Quicken Loans employee wrote "[Robinson's] attitude and demeanor [have] improved, but her work output still struggles greatly and the team does not know what they can rely on her for." (*Id*.) On August 31, 2018, [Robinson] was given a second warning, this time in writing and signed by Joe Brach as team leader. This warning emphasized the need for immediate improvement and described several instances since [Robinson]'s verbal warning where [Robinson]'s performance and behavior had not met expectations. (*See* ECF No. 17-8.)

Schiefer alleges she continued to try to help [Robinson] after she was issued the written warning. (ECF No. 17, *Defendant's Motion*, 5.) Believing that a change of scenery might improve [Robinson]'s performance, she endorsed [Robinson] for a transfer to another team in October of 2018. (*Id*. at 5-6.) On October 16, Schiefer and Joe Brach met with [Robinson] to discuss her transition to the new team. According to Schiefer's notes from that meeting, Brach pointed out to [Robinson] that she had been coming in late and leaving early even though employees were expected to work full eight-hour days. (*See* ECF No. 17-5.) [Quicken Loans] states "[Robinson] acknowledged the message, left the meeting, went back to her desk for about 10 minutes, and then left early" having only worked approximately seven hours that day. (ECF No. 17, *Defendant's Motion*, 6.) Thereafter, Schiefer

recommended termination and [Robinson]'s employment was terminated on October 19, 2018.

R. 24, Opinion & Order, PageID# 463-68.

Shortly after her termination, Robinson filed a charge of discrimination with the EEOC. On October 24, 2019, Robinson sued Quicken Loans in the Eastern District of Michigan. Robinson alleged that Quicken Loans created a hostile workplace environment and that her discharge constituted race and gender discrimination, and retaliation, in violation of Title VII. Further, Robinson claimed that Quicken Loans created a retaliatory hostile workplace environment, also in violation of Title VII. Robinson also asserted claims under Michigan's Elliot-Larsen Civil Rights Act (ELCRA), but on November 1, 2019, the district court dismissed all of Robinson's state law claims without prejudice.

Following discovery, Quicken Loans moved for summary judgment on all of Robinson's remaining claims, and the district court granted the motion in full.[2] In granting the motion, the district court concluded Robinson failed to present direct evidence of discrimination and that she failed to establish a prima facie case of race or sex discrimination using circumstantial evidence. The district court also determined that Quicken Loans articulated a legitimate, nondiscriminatory reason for terminating Robinson, and that Robinson failed to present evidence demonstrating that Quicken Loans' stated reasons were pretextual. Finally, the court concluded that Robinson failed to state a prima facie case on both her retaliation and hostile workplace claims. Robinson timely appeals from the district court's grant of summary judgment on all of her claims.

---

[2] While Quicken Loans' motion for summary judgment states plainly that its motion pertains to all of Robinson's remaining claims, it did not articulate any arguments on Robinson's retaliatory hostile workplace environment claim.

## II. DISCUSSION

### A. Standard of Review

We review a district court's grant of summary judgment *de novo*. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 301 (6th Cir. 2016); *Johnson v. Kroger Co.*, 319 F.3d 858, 864 (6th Cir. 2003) (citation omitted). Summary judgment is only appropriate when no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). On summary judgment, we view the evidence in the light most favorable to the nonmoving party—here, Robinson—and make all reasonable inferences in her favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "A dispute of a material fact is genuine so long as the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016) (quotations omitted). At this stage, we ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Robinson, as the nonmoving party, cannot withstand summary judgment, however, by offering a "mere scintilla" of evidence in her favor. *Maben v. Southwestern Med. Clinic*, 630 F. App'x 438, 441 (6th Cir. 2015) (quotations omitted).

### B. Title VII General Framework

Before filing a lawsuit stating claims under Title VII, a plaintiff must first exhaust her administrative remedies by filing a charge with the EEOC within a reasonable time after the alleged wrongful act or acts. *See* 42 U.S.C. § 2000e-5(e)(1); *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010). Under Title VII, it is unlawful for an employer "to . . . discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's

race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Robinson may establish a prima facie case of employment discrimination by producing direct evidence of discrimination or by using the *McDonnell Douglas* burden-shifting paradigm. *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 561 (6th Cir. 2004) (citations omitted); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

### C. Race and Gender Discrimination Claims

On appeal, Robinson maintains that she can establish a prima facie case of race and sex discrimination with direct and circumstantial evidence, therefore we will address each of them in turn. Further, because the district court addressed Robinson's race and sex discrimination claims together, we do the same.

*Direct Evidence of Discrimination*

Direct evidence, when it is believed, "requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Johnson*, 319 F.3d at 865 (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). Further, direct evidence of discrimination does not require any inferences to conclude that the challenged action was motivated at least in part by prejudice against members of the protected group. *Id.* (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (explaining that "a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent")). In other words, when direct evidence is provided, no inferences are needed in order to conclude that discrimination on the basis of race and/or gender is afoot. *See Tennial*, 840 F.3d at 302 (citation omitted). "Where a plaintiff presents direct evidence of discriminatory intent in connection with a challenged employment action, 'the burden of both production and persuasion

shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination.'" *Johnson*, 319 F.3d at 865 (quoting *Nguyen*, 229 F.3d at 563).

Robinson maintains that she presented "multiple and numerous actions that show direct evidence of Defendant's sexist and racist intent." Appellant Br. at 26. The district court found that none of the instances Robinson presented "compel[s] the conclusion that Schiefer's decision to discharge [Robinson] was motivated by racial or gender animus." We agree.

Robinson directs us to several instances that, she argues, constitute direct evidence of race and sex discrimination. First, Robinson asserts that Schiefer told her that her male colleagues "have earned their right to act abrasively." Appellant Br. at 25. During her deposition, Robinson recounted an exchange with Schiefer regarding her perception of the treatment of Black women within the I.T. department at Quicken Loans. Robinson testified:

> [T]here's this stereotype, right. And it just happens to women in general, but it also happens to women of color, especially of my skin tone, much stronger. So, if you say something in a meeting or if you're talking to -- it's dominantly males in I.T. Everything that you say as a woman is taken completely different as a male if a man says the exact same thing. I had a situation that I documented with HR that was just that. But it's taken differently coming out of my female mouth, and it's taken even more differently coming out of my black female mouth.
>
> …
>
> It's taken with, my same male counterparts who were way more direct and way more, what I felt was of disrespect . . . . And even when I talked to [Schiefer] about this, she told me that . . . the men that I used in the example have proved themselves. That's literally what she said. They proved themselves."

R. 22-1, Robinson Deposition, PageID# 292. Robinson thus argues that Schiefer's comment "was made explicitly about gender." Appellant Br. at 25.

Second, Robinson directs us to another incident, where, after a disagreement with a colleague on her team, the colleague, in trying to explain why they could not "come to an

agreement," told Robinson that, "maybe we were raised differently." *Id.* at 26. Robinson asserts that she was sometimes ordered to "perform demeaning tasks such as ordering lunch, picking up lunch, cleaning up after meetings, scheduling meetings, and taking notes," that these tasks were not in her job duties, and that "only women" were asked to perform these duties. *Id.* at 27. Further, Robinson recounts an occasion where she "requested an update from a colleague, and her superior mockingly stated that [Robinson] was cracking the whip." *Id.* She also directs the Court to an instance where she was the only woman in a meeting and she tried to follow up on a colleague's update, but "the entire meeting stopped and her colleagues were taken aback." *Id.* Finally, Robinson also testified, generally, about her perception "that she was consistently undermined, disrespected, belittled, and 'mansplained.'" *Id.*

Despite Robinson's arguments to the contrary, the instances she cites do not require the conclusion that "unlawful discrimination" on the basis of race or sex "was at least a motivating factor" in Quicken Loans' actions. *See Johnson*, 319 F.3d at 865. Robinson herself had to make inferences and interpretations of the instances and workplace culture she offered as direct evidence. "The need to draw such inferences prevents these remarks from constituting direct evidence of discrimination." *Id.* (citation omitted). Because Robinson fails to present direct evidence of race or sex discrimination, her claims must be analyzed using the *McDonnell Douglas* framework.

*Indirect Evidence of Discrimination*

We now apply the burden-shifting framework developed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to determine whether Robinson has presented "sufficient evidence to survive summary judgment." *Jackson*, 814 F.3d at 775-76 (citing *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240 (6th Cir. 2005)). Under the *McDonnell*

*Douglas* framework, Robinson "bears the initial burden of establishing a prima facie case of discrimination." *Id.* at 776 (citation omitted). Robinson must show that she was "(1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and (4) replaced by a person outside the protected class or treated differently than similarly situated nonminority employees." *Tennial*, 840 F.3d at 303 (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). If Robinson establishes these elements, then Quicken Loans must articulate a "legitimate, nondiscriminatory reason" for her termination. *Id.* (citing *McDonnell Douglas Corp.*, 411 U.S. at 802). Assuming Quicken Loans has done this, the burden shifts back to Robinson to show that Quicken Loans' proffered explanation "was not its true reason, but merely a pretext for discrimination." *Jackson*, 814 F.3d at 776 (citation and quotation omitted).

In the district court, only the final element was disputed—whether Robinson introduced evidence that she was treated differently than similarly-situated nonminority employees—so the district court limited its discussion to this factor. Accordingly, our discussion is limited to the similarly-situated determination.

This Court, in *Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992), noted three factors relevant to determining whether employees are similarly situated in the context of cases alleging disparate disciplinary action. "[T]o be deemed 'similarly-situated,' the individuals with whom [Robinson] seeks to compare [her] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* at 583. We later clarified that exact correlation is not required for comparators to be similarly situated but that the plaintiff and the employee "with whom the plaintiff seeks to compare [herself] must be similar in 'all of the *relevant* aspects.'" *Jackson*, 814 F.3d at 777

(emphasis in original) (quotation omitted) (tracking the evolution of the "similarly situated" inquiry).

Ultimately, in evaluating the similarly-situated factor in the differential discipline context, as here, we look to whether the comparator's actions were of comparable seriousness to the conduct for which Robinson was discharged. *See id.* (noting that a plaintiff does not have to establish identical behavior by a comparator); *see also Tennial*, 840 F.3d at 304. And while there is no dispositive list of factors, we make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the nonprotected employee based on the facts of the case. *Id.*

Robinson maintains that she presented evidence of disparate treatment. Quicken Loans argues that Robinson did not identify any comparator that would be deemed similarly situated. Robinson does not identify any of her former colleagues who were repeatedly instructed to adjust their attitude, behavior, and attendance. We agree.

Robinson does not provide evidence that her suggested comparator colleagues allegedly engaged in the range of activities for which she was discharged. To her credit, Robinson does compare herself to colleagues from her team, who were presumably supervised by Schiefer. However, Robinson—the only business analyst on her team—has not provided any evidence that these individuals engaged in similar conduct and received a lesser punishment. Differences in experience and disciplinary history establish that Robinson and her comparators, such as they are, are not similarly situated. *See Tennial*, 840 F.3d at 304. As the district court correctly noted, Robinson "has not identified a single member of her own team accused of the[] same misdeeds"— tardiness, regular absences, and poor feedback on annual and mid-year reviews. In fact, for each of the individuals Robinson offers as a comparator, Quicken Loans has introduced undisputed

evidence to the contrary. Because Robinson's comparators were not similar "in all relevant respects," Robinson has not satisfied the similarly-situated element and cannot establish a prima facie case of race or sex discrimination. *See id.* The district court properly granted summary judgment on Robinson's discrimination claims.

### D. Retaliation Claim

Turning to Robinson's retaliation claims. Robinson seeks to prove retaliation through circumstantial evidence. Therefore, we will analyze her retaliation claim through the burden-shifting framework provided in *McDonnell Douglas*. *Strickland v. City of Detroit*, 995 F.3d 495, 510 (6th Cir. 2021). If Robinson establishes a prima facie case of retaliation, then Quicken Loans must "'articulate some legitimate, non-discriminatory reason for its actions.'" *Id.* (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)). If Quicken Loans succeeds in articulating a legitimate, non-discriminatory reason for its actions, then Robinson can still prevail on her retaliation claim if she can demonstrate that the proffered reason was not the actual reason for her termination. *See id.*

To establish a prima facie case of retaliation under Title VII, Robinson must show that "(1) [s]he engaged in activity protected by Title VII; (2) [her] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to [her]; and (4) a causal connection existed between the protected activity and the materially adverse action." *Id.* This Court has explained that "the burden of establishing the prima facie retaliation case is easily met." *Singfield*, 389 F.3d at 563 (citation omitted). "Although no one factor is dispositive in establishing a causal connection, evidence . . . that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Id.* (quoting *Nguyen*, 229 F.3d at 563). In *Singfield*, the plaintiff, Singfield, was terminated "just over

three months after he filed a discrimination charge with the" EEOC. *Id.* The Court agreed with Singfield's contention that the temporal proximity between the two events—his filing of a discrimination charge with the EEOC and his termination—was "significant enough to constitute sufficient evidence of a causal connection for the purpose of" making a prima facie case of retaliation. *Id.* (citations omitted).

In *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008), the Court reconciled its seemingly conflicting rulings in *Nguyen* and *Cooper v. City of N. Olmsted*, 795 F.2d 1265 (6th Cir. 1986), and concluded that the language in *Cooper* "does not preclude plaintiffs from ever using a temporal proximity closer than four months to establish an inference of retaliation." *Mickey*, 516 F.3d at 524. *Mickey* followed *Nguyen*'s expansive reading of this Court's precedents, noting that none of the cases interpreted in *Nguyen* "squarely stands for the proposition that temporal proximity alone may never show a causal connection." *Id.* After examining additional cases decided between *Nguyen* and *Cooper*, this Court explained:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection . . . . But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Id.* at 525 (citation omitted).

In support of her claim that she can make the requisite temporal proximity showing under *Mickey*, Robinson notes that she received her first formal discipline—the verbal warning—right after she first began sharing complaints and concerns with human resources, and that "things really got way worse after." Robinson adds that she "testified that she had been meeting with human resources about her complaints the very week" she was terminated. Appellant Br. at 21. Robinson takes too narrow a view of the relevant events. Robinson began sharing complaints about Schiefer

approximately two years before her termination, and her visit to human resources regarding a verbal warning occurred five months before she was terminated. Because "some time elapse[d]" between Robinson's complaints and her termination, Robinson needed—and failed—to present any "other evidence of retaliatory conduct" and consequently she cannot establish causation. *See Mickey*, 516 F.3d at 525. Therefore, the district court properly granted summary judgment on Robinson's retaliation claim.

### E. Hostile Workplace Claim

Finally, Robinson claims that Quicken Loans created a hostile workplace environment based on race under Title VII. To establish her prima facie claim of a hostile work environment, Robinson must demonstrate that (1) she belongs to a protected group; (2) she was subject to unwelcome harassment; (3) that harassment was based on race; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment; and (5) the employer knew or should have known about the harassment and failed to take appropriate remedial action. *See Strickland*, 995 F.3d at 503 (citation omitted). In other words, a hostile work environment is a "workplace [] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (cleaned up).

In examining the conduct at issue, we consider "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's work performance." *Id*. at 23. Further, "[f]acially neutral abusive conduct can support a finding of . . . animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, *overtly* . . . discriminatory conduct." *Jordan v. City of Cleveland*, 464 F.3d 584, 596 (6th Cir.

2006) (emphasis added) (quotations omitted). Ultimately, "[m]ere disrespect or antipathy will not be actionable . . . unless a plaintiff can prove that such was motivated by discriminatory animus." *Strickland*, 995 F.3d at 507 (citations omitted); *see also Phillips v. UAW Int'l*, 854 F.3d 323, 325 (6th Cir. 2017) (affirming a grant of summary judgment for defendants where the plaintiff's evidence included "a smattering of offensive conduct," allegations of violent conduct, and "frequent racial comments").

On appeal, Robinson argues that she presented sufficient evidence of a genuine dispute of material fact on her workplace harassment claim. To support her hostile workplace claim, Robinson cites the same comments and conduct on which she bases her race and gender discrimination claims, which the Court has summarized above. *See supra* Section II.C. Quicken Loans maintains that Robinson presented no evidence "that could support a finding that Robinson's workplace was permeated with 'discriminatory intimidation, ridicule, and insult.'" Appellee Br. at 25. We agree.

Robinson asserts that she "provided two examples of explicit racism and sexism, one by a superior," Appellant Br. at 37, but these examples are plainly insufficient to establish a genuine factual dispute as to whether the alleged harassment was sufficiently severe or pervasive to alter the conditions of her employment. *See Strickland*, 995 F.3d at 507 (concluding that the evidence of five incidents of racial harassment over "more than ten years" was not frequent conduct); *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 310-11 (6th Cir. 2016) (reasoning that the evidence of four incidents over a six-month period established the frequency of conduct). Although Robinson may very well have understood her colleagues' remarks to be racist or sexist, these incidents were neither severe nor pervasive enough to sustain an actionable hostile workplace claim. *See Phillips*, 854 F.3d at 328 (holding that "[t]he misconduct alleged here—a handful of offensive comments

and an offensive meeting over a two-year period—does not" amount "to actionable discriminatory conduct under a hostile work environment theory"). Robinson's own deposition testimony that she continues to enjoy strong professional relationships with many of her former colleagues on Team Frontier only serves to confirm that there is no genuine issue of material fact on her hostile work environment claim. Accordingly, we affirm the district court's grant of summary judgment on Robinson's hostile workplace environment claim.

### F. Retaliatory Hostile Workplace Claim

As a last resort, Robinson argues that the district court erred in granting summary judgment on her retaliatory hostile workplace claim, which is "a variety of retaliation." *Khamati v. Secretary of the Dept. of the Treasury*, 557 F. App'x 434, 443 (6th Cir. 2014) (citing *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000)). To state a retaliatory hostile work environment claim, Robinson must show that: (1) she engaged in a protected activity; (2) Quicken Loans knew this; (3) Quicken Loans subjected Robinson to severe or pervasive retaliatory harassment; and (4) the protected activity is causally connected to the harassment. *See id*. Despite Robinson's contestations, the district court properly granted summary judgment on this claim. Just as her individual retaliation and hostile workplace claims failed, Robinson's retaliatory hostile workplace claim also fails because she has not offered any analysis or evidence in support of reversing the district court's conclusion on her retaliatory hostile workplace claim. *See, e.g.*, *Strickland*, 995 F.3d at 511 (citations omitted) (rejecting a defendant's conclusory assertions on the causation element in a retaliation case where "[n]o analysis or evidence [was] offered on appeal in support" of reversal). Ultimately, as with Robinson's other claims, the district court properly granted summary judgment in favor of Quicken Loans on Robinson's retaliatory hostile work environment claim.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court granting summary judgment in favor of Quicken Loans.